## DUNLOP *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF ILLINOIS.

No. 472.    Argued December 21, 1896.—Decided February 15, 1897.

There was no error in overruling. the motion of the defendant, made prior to the trial, to require the District Attorney to file the printed matter alleged.in the indictment to be obscene, lewd, lascivious and indecent.

There was no error in the admission of the advertisements of proprietorship of. the Dispatch as it is difficult to see how the identity of the paper,

which the indictment averred that the defendant deposited in the post office for mailing, could have been more conclusively proved than by the production of a newspaper called the Dispatch, and purporting to be the official paper of the city of Chicago.

There was no error in permitting government officers in the Post Office Department to testify as to the course of business in the respective offices with which they were connected, with a view of proving the customs of the post office, the course of business therein, and the duties of the employés connected with it.

Where a question is made whether a certain paper or other document has reached the hand of the person for whom it is intended, proof of a usage to deliver such papers at the house, or of the duty of a certain messenger to deliver such papers, creates a presumption that the paper in question was actually so delivered.

There was no error in permitting the government to prove that during the three years preceding the trial, and also during the period covered by the dates of the papers, admitted in evidence, namely, July 6 to October 19, 1895, a newspaper, purporting to be the Chicago Dispatch, was regularly on each day, except Sunday, received in great quantities at the Chicago post office for mailing and delivery.

Whether the matter is too obscene to be set forth in the record is a matter primarily to be considered by the District Attorney in preparing the indictment; and, in any event, it is within the discretion of the court to say whether it is fit to be spread upon the records or not; and error will not lie to the action of the court in this particular.

There is no merit in the assignment of error taken to the action of the court, in refusing to direct a verdict of not guilty at the close of the testimony.

In his argument to the jury the District Attorney said: " I do not believe that there are twelve men that could be gathered by the venire of this court within the confines of the State of Illinois, except where they were bought and perjured in advance, whose verdict I would not be willing to take upon the question of the indecency, lewdness, lasciviousness, licentiousness and wrong of these publications." To this language counsel for the defendant excepted. The court held that it was improper, and the District Attorney immediately withdrew it. *Held,* that the action of the court was commendable in this particular, and that this ruling, and the immediate withdrawal of the remark by the District Attorney, condoned his error in making it, if his remark could be deemed a prejudicial error.

There was no error in the remarks of the District Attorney as to massage treatment.

There was no error in instructing the jury that: " It is your duty to come to a conclusion upon all those facts, and the effect of all those facts, the same as you would conscientiously come to a conclusion upon any other set of facts that would come before you in life." " There is no technical rule; there is no limitation in courts of justice, that prevents you from

applying to them (the facts and circumstances in evidence) just the same rules of good, common sense, subject always, of course, to a conscientious exercise of that common sense, that you would apply to any other subject that came under your consideration and that demanded your judgment."

There was no error in the following instructions as to obscene publications:
"Now, what is (are) obscene, lascivious, lewd or indecent publications is largely a question of your own conscience and your own opinion; but it must come — before it can be said of such literature or publication — it must come up to this point: that it must be calculated with the ordinary reader to deprave him, deprave his morals, or lead to impure purposes. . . . It is your duty to ascertain in the first place if they are calculated to deprave the morals; if they are calculated to lower that standard which we regard as essential to civilization; if they are calculated to excite those feelings which, in their proper field, are all right, but which, transcending the limits of that proper field, play most of the mischief in the world."

In view of the previous instructions of the court, there was no error in refusing to instruct the jury that the presumption of innocence was stronger than the presumption that the government employés who delivered the newspapers to Mr. Montgomery in the Chicago post office building obtained such papers from the mails; or that the presumption that the person who deposited them in the box in the St. Louis post office building from which box the witness McAfee took the papers obtained them from the mails.

THIS was a writ of error to review the conviction of the plaintiff in error for unlawfully depositing and causing to be deposited, upon the days set out in the various counts, in the post office at Chicago, for mailing and delivery, a newspaper called the Chicago Dispatch, containing obscene, lewd, lascivious and indecent matter. There were thirty-two counts in the indictment. The District Attorney, under order of the court, elected to proceed upon the first, sixth, twelfth, sixteenth, twenty-sixth and thirty-second counts. The other counts were quashed, and no evidence was offered to sustain the first count.

The sixth count was as follows :

"And the grand jurors aforesaid under their oath aforesaid do further present that the said Joseph R. Dunlop, on the sixth day of July, in the year aforesaid, at Chicago aforesaid, in the division and district aforesaid, unlawfully did knowingly deposit and cause to be deposited in the

post office of the said United States there, for mailing and delivery, a large number of copies, to wit, one hundred copies of a certain paper, print and publication entitled The Chicago Dispatch, one of which said copies was then and there directed to Mr. Montgomery, at Chicago aforesaid; another to R. M. Williams, box 801, at St. Louis, Missouri, and the rest to divers persons, respectively, to the said grand jurors unknown, and each of which last-mentioned copies was then and there a copy of the five-o'clock edition of the day in this count aforesaid and number 840 of the said paper, print and publication, and contained (amongst other things) on the eleventh page thereof and under the headings of Personal and Baths, certain obscene, lewd, lascivious and indecent matters in print, of too great length and of too indecent character to be here set forth in full, against the peace and dignity of the said United States and contrary to the form of the statute of the same in such case made and provided."

The other counts differed from this only in the dates of the newspapers alleged to have been mailed, and the days upon which they were deposited in the post office.

The testimony introduced by the government tended to show that there was published in the city of Chicago, during the year 1895, and the three years immediately prior thereto, a daily and weekly newspaper entitled The Chicago Dispatch; that the plaintiff in error, Joseph R. Dunlop, was the publisher of said newspaper during those years; that copies of the Chicago Dispatch in large numbers were deposited in the Chicago post office for mailing and delivery during said years, daily except Sunday; that the copies of the Chicago Dispatch described in the indictment as directed to Mr. Montgomery at Chicago, and the copies of the Chicago Dispatch described in the indictment as directed to R. M. Williams, box 801, at St. Louis, Missouri, were deposited for mailing and delivery at the post office in Chicago on the dates of said several copies; that all the copies of said Chicago Dispatch, so directed to said R. M. Williams and Mr. Montgomery, contained therein, under the headings of Personal and Baths, certain advertisements that were obscene,

lewd, lascivious and indecent; and that the plaintiff in error, by reason of being the publisher of said Chicago Dispatch, was liable for the alleged depositing in said post office of said newspapers, so directed to said R. M. Williams and Mr. Montgomery.

Defendant was found guilty, and after motions for a new trial and in arrest of judgment had been overruled, was sentenced to imprisonment to hard labor in the penitentiary for two years, and to pay a fine of $2000 and costs.

Thereupon he sued out this writ, assigning sixty-one errors as grounds for reversal. These errors related to the refusal of the court, prior to the trial, to order the District Attorney to file the printed matter, alleged to be obscene, or copies of the same; to the admission of improper testimony, including all the newspapers introduced; to the refusal of the court at the close of the testimony of the government to direct a verdict of not guilty; to prejudicial remarks made by the District Attorney in his argument to the jury; to the giving of improper instructions, and to the refusal to give proper instructions requested on behalf of the plaintiff in error.

Mr. *William S. Forrest* and Mr. *A. H. Garland* for plaintiff in error.

Mr. *Attorney General* and Mr. *Assistant Attorney General Dickinson* for defendants in error.

MR. JUSTICE BROWN, after stating the case, delivered the opinion of the court.

In passing upon this case we shall notice only such errors as were pressed upon our attention in the argument or briefs of counsel.

1. The first assignment is to the alleged error of the court in overruling the motion of the defendant, made prior to the trial, to require the District Attorney to file the printed matter alleged in the indictment to be obscene, lewd, lascivious and indecent, for the purpose of enabling the defendant to demur to the indictment. Defendant's petition for this

order stated as the reason for it that, if the advertisements complained of were not filed, his counsel "must investigate and critically examine" over three thousand advertisements and notices, and that he would "necessarily be confused and embarrassed," and unable "to make suitable preparations to sustain his defence." It is nowhere stated that he desired it for the purpose of demurring to the indictment, and if it had been furnished it would not have been the subject of demurrer, since it is no part of the record. *Commonwealth* v. *Davis,* 11 Pick. 432. If the indictment be not demurrable upon its face, it would not become so by the addition of a bill of particulars.

Beyond this, however, the application is one addressed to the discretion of the court, and its action thereon is not subject to review. *Rosen* v. *United States,* 161 U. S. 29, 35; *Commonwealth* v. *Giles,* 1 Gray, 466; *Commonwealth* v. *Wood,* 4 Gray, 11; *State* v. *Bacon,* 41 Vermont, 526. While such applications are ordinarily, and should be, granted, wherever the accused is liable to be surprised by evidence for which he is unprepared, it is difficult to see how the defendant in this case was prejudiced by its refusal. The alleged obscene matter was contained in a published newspaper to which his own name was attached as proprietor, and of which he had in fact been the proprietor for several years, the days and editions of which were set forth in the several counts. He was duly informed upon the trial of what particular advertisements the government complained, and requested the court to charge the jury they were not obscene, within the meaning of the law. He thus gained every advantage that he could possibly have had by the production of the advertisements prior to the trial.

2. The second and five other assignments of error are taken to the admission of the following advertisements of proprietorship, appearing in the several editions set forth in the indictment, upon the ground that there was no proof that the newspapers, from which they were taken, were copies of the Chicago Dispatch, and that they did not tend to show who was the publisher:

# The Dispatch.

By JOSEPH R. DUNLOP.

**AN INDEPENDENT AFTERNOON DAILY PAPER**
THREE EDITIONS DAILY—12, 3 AND 5 O'CLOCK.

Official Paper of the City of Chicago
——— AND ———
Official Paper of Cook County.

It is difficult to see how the identity of the paper, called the Chicago Dispatch, which the indictment averred that the defendant deposited in the post office for mailing, could have been more conclusively proved than by the production of a newspaper called the Dispatch, and purporting to be the official paper of the city of Chicago. In that particular the paper proved itself.

While the addition of the words "by Joseph R. Dunlop," might not have been, standing alone, sufficient evidence of his being the proprietor of the paper, and the cause of its being mailed, yet, in view of the fact that the name of the publisher usually follows the name of the paper in that connection, it certainly had a tendency in that direction, and was, therefore, admissible, particularly when it was shown by other testimony that defendant had stated that he was the proprietor and publisher of this paper; that a paper of this name had been for a long time printed and circulated by him; that it had for a long time and in large numbers passed through the post office; that he had negotiated for the renting of a building for the purpose of publishing a paper called the Dispatch; that he had conversations with witnesses in regard to the publication of a paper of that name; that, as proprietor, he had caused papers, similar to these, to be sent through the post office, and that the accounts for postage had been rendered to him.

3. The eighth assignment was taken to an alleged error in permitting the witness McAfee to testify that it was the duty of a certain messenger of the post office inspector, whose

office was in the post office building at St. Louis, Missouri, to take the mail from the post office, and distribute it in the private boxes of persons who had desk room in the inspector's office.

The thirteenth assignment was taken to a similar alleged error in permitting the witness Montgomery to testify that it was among the duties of a government employé, not a mail carrier, to take from a table called the round table, in the mailing department of the Chicago post office, a copy of the Dispatch, and deliver it to him in the office occupied by him as superintendent of mails in the government building at Chicago, and that it was in this way that the newspapers identified by Montgomery were received by him.

Each count in the indictment, upon which the trial was had, charged a mailing of the Dispatch to Montgomery at Chicago, as well as one to Williams, box 801, at St. Louis.

Montgomery's testimony tended to show that he had been superintendent of the mails at the Chicago post office for six years past; had charge of the receipt and dispatch of all mails in and out of that office, and knew that there was a publication passing through the office known as the Chicago Dispatch; that he received the papers, put in evidence, in the Chicago post office from what is known as the round table, the place at which the mail comes into the office from a platform, where it is received direct from the publication office; that it was delivered to him by a messenger through the regular channels of the mail in the same manner that all other papers of this kind were delivered, and subsequently turned over to Mr. McAfee. He was then asked the question, "What are the duties of that messenger?" — that is, the one who brought to his office from the round table in the post office building the papers he had identified. To this question objection was made.

The witness McAfee testified that he was a post office inspector, commissioned but not paid by the Government, and was also a commission agent of the Western Society for the Prevention of Vice; that on June 12, 1895, he addressed a letter to the Dispatch of Chicago, enclosing therein the sum

of $1.25, requesting the Dispatch to be sent to R. M. Williams, box 801, St. Louis, Missouri, for three months from date, signing the letter " R. M. Williams "; that he received the papers, identified by him, from his box in the inspector's office in St. Louis; that he did not take them from his box in the post office; that his mail was put in the box by a messenger from the inspector's office, whose office was in the post office building ; that the only way that he knew that the paper came in the mail was that he found it in his private box in the inspector's office ; that he had received his mail in that way for ten years; that it was not a post office box in the same sense as 801, but was simply a box where his mail was deposited. He was then asked " Who was this messenger who delivered these papers ? " to which objection was made, and he answered that he was a messenger for gathering the mail for inspectors, and distributing it in boxes provided in the post office.

The testimony of both of these witnesses was objected to upon the ground that they testified nothing as to the delivery of these papers of their own personal knowledge. It is claimed that the error consisted in assuming that the papers, purporting to be the Dispatch, which McAfee testified that he found in his private box in the inspector's office, were deposited in that box by the clerk or messenger, and then in permitting McAfee to testify that it was the duty of the clerk or messenger to take the mail from the post office, and distribute the same in certain private boxes in the inspector's office. A similar objection was made to the testimony of Montgomery.

It is unnecessary to dwell upon these assignments at any length. While the witnesses were not personally cognizant of the fact that these very papers were placed in their private boxes, it was perfectly competent for them to prove the customs of the post office, the course of business therein and the duties of the employés connected with it. If it were the duty of this messenger to take these papers from the office and deliver them in the private boxes of these witnesses, and the papers identified were there found, it would be proper for the jury to infer that they had been delivered in the usual way, after having been mailed at the post office in the city of pub-

lication. Both of these witnesses were government officers, and testified as to the course of business in the respective offices with which they were connected. There was no error in permitting them to do so.

This question was elaborately considered by Mr. Justice Bradley in the *Knickerbocker Life Ins. Co.* v. *Pendleton*, 115 U. S. 339, in which evidence of the custom and usage of a bank, offered in support of the evidence of the cashier of his conviction and belief that a draft had been presented for payment, came within the rule which allowed the course of business to be shown for the purpose of raising a presumption of fact in aid of collateral testimony. Indeed, the authorities are abundant to the proposition that, where a question is made whether a certain paper, or other document, has reached the hand of the person for whom it is intended, proof of a usage to deliver such papers at the house, or of the duty of a certain messenger to deliver such papers, creates a presumption that the paper in question was actually so delivered. Business could hardly be carried on without indulging in the presumption that employés, who have certain duties to perform and are known generally to perform such duties, will actually perform them in connection with a particular case. Thus, if it be shown that a letter, properly stamped, has been mailed, there is a presumption that it reached the person addressed; or, if letters properly directed to a gentleman be left with his servant, it is reasonable to presume that they reached his hands. *Macgregor* v. *Keily*, 3 Exch. 794; *Skilbeck* v. *Garbett*, 7 Q. B. 846; *Hetherington* v. *Kemp*, 4 Campbell, 193; *Dana* v. *Kemble*, 19 Pick. 112; *Goetz* v. *Bank of Kansas City*, 119 U. S. 551; 1 Greenl. on Ev. § 40.

4. Thirteen assignments of error were taken to the ruling of the court in permitting the government to prove that, during the three years preceding the trial, and also during the period covered by the dates of the papers, admitted in evidence, namely, July 6 to October 19, 1895, a newspaper, purporting to be the Chicago Dispatch, was regularly on each day, except Sunday, received in great quantities at the Chicago post office for mailing and delivery.

The object of the government in offering this testimony was to show that, upon the days stated in the several counts, large numbers of copies of this paper were actually received at the Chicago post office for mailing, and that though said copies were not identified as the papers described in the indictment, the packages may be presumed to have contained them. As every copy of the same edition of a paper is almost necessarily an exact duplicate of every other copy of the same edition, proof that a certain edition was mailed in large quantities every day at a certain post office was certainly competent evidence that papers received by the two persons mentioned in the indictment, purporting to be of that edition, were in fact among the number that were mailed upon that date. Unless the paper were marked before delivery to the post office at Chicago, it would be impossible to say whether that identical paper was mailed; but if large numbers of that edition were mailed every day, it would be practically safe for the jury to assume that the papers identified were among the number. This testimony, taken in connection with that of the two witnesses McAfee and Montgomery, showed with reasonable, if not absolute, certainty that the papers which they received and identified were among those which had been actually mailed. It is true that this testimony did not affirmatively show that the papers thus received belonged to the five o'clock edition of the Dispatch; but, while this may have detracted from the force of the testimony, it did not render it incompetent. As the evidence showed that large quantities of this paper were mailed every day, and that McAfee and Montgomery received, as part of their mail matter, copies of the five o'clock edition of that paper, it was for the jury to say whether these copies were not a part of the papers that were so mailed.

5. The twenty-fifth and six following assignments were taken to the admission of the copies of the Dispatch set forth in the indictment. These exhibits were substantially copies of each other. Such of the advertisements as were relied upon were marked, by order of the court, in blue pencil during the argument to the jury. They were objected to upon

the ground that the evidence failed to show that they were deposited in the post office by the defendant, or that they were copies of the Chicago Dispatch; both of which objections have been already disposed of. Also that it did not appear that they contained matter that was too long, or too obscene, to be set out in the indictment, or to be spread upon the records of the court. Whether the matter was too obscene to be set forth in the record was a matter primarily to be considered by the District Attorney in preparing the indictment; and, in any event, it was within the discretion of the court to say whether it was fit to be spread upon the records or not. We do not think that error will lie to the action of the court in this particular.

6. The thirty-second assignment of error was taken to the action of the court in refusing to direct a verdict of not guilty at the close of the testimony. This assignment is based partly upon the ground that there was no sufficient evidence of the mailing of the papers in question, which has already been disposed of, and partly because the evidence failed to show that the defendant knew that any of the advertisements complained of were contained in the copies of the Chicago Dispatch put in evidence; or that these papers contained anything which was obscene or indecent. We think, however, that the evidence was amply sufficient to lay before the jury. It was shown that Mr. McAfee had repeatedly talked with the defendant about his paper, of which he admitted himself to be the responsible head; that defendant was told there had been complaints made about its character, and that in the opinion of the District Attorney the advertisements, under the heads of Personal and Baths, were improper and illegal; that Mr. Dunlop replied that he scarcely ever saw the advertisements until after they had been published; that he had instructed his agent to scrutinize them with more care. He said that all of the newspapers had carried such advertisements in times past, until they became wealthy, and then complained about others that did the same. He did not deny a general knowledge of the contents of his paper, and it was scarcely possible that he could have been the responsible

head of the establishment for a number of years, as the testimony tended to show, without personal knowledge of the character of the advertisements.

7. The thirty-fifth and thirty-sixth assignments of errors were taken to certain remarks made by the District Attorney in his argument to the jury, one of which is as follows: "I do not believe that there are twelve men that could be gathered by the venire of this court within the confines of the State of Illinois, except where they were bought and perjured in advance, whose verdict I would not be willing to take upon the question of the indecency, lewdness, lasciviousness, licentiousness and wrong of these publications." To this language counsel for the defendant excepted. The court held that it was improper, and the District Attorney immediately withdrew it. The action of the court was commendable in this particular, and we think this ruling, and the immediate withdrawal of the remark by the District Attorney, condoned his error in making it, if his remark could be deemed a prejudicial error. There is no doubt that, in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused. In such cases, however, if the court interfere, and counsel promptly withdraw the remark, the error will generally be deemed to be cured. If every remark made by counsel outside of the testimony were ground for a reversal, comparatively few verdicts would stand, since in the ardor of advocacy, and in the excitement of trial, even the most experienced counsel are occasionally carried away by this temptation.

Complaint is also made of the remark of the District Attorney to the following effect: "Now, gentlemen, it is not necessary for me to tell you what the massage treatment is; how a man is stripped naked, from the sole of his feet to the crown of his head, and is rubbed with the hands." If the counsel gave a wholly erroneous definition of the word "massage," or misled the jury by giving them a false impression of the operation, the remark might be prejudicial, and possible ground for error. But as the word is defined as "a rubbing

or kneading of the body," an operation which could hardly be carried on unless the person were divested of his clothing, we see no error in the remark of the District Attorney in this case. As the massage treatment is comparatively a recent device, it is quite possible that it may not have been understood by all the members of the jury, but if the District Attorney fairly explained to them what it is ordinarily understood to be, and gave an explanation which was not radically wrong, there was no impropriety in his doing so.

A large number of exceptions were taken to various portions of the charge to the jury, and to the refusal of the court to give certain instructions requested by the defendant. Some of these have already been passed upon in connection with the testimony; some are too obviously frivolous to justify discussion, but two or three of them demand an independent consideration.

8. The forty-second and forty-third assignments were taken to the following instructions:

"It is your duty to come to a conclusion upon all those facts, and the effect of all those facts, the same as you would conscientiously come to a conclusion upon any other set of facts that would come before you in life." "There is no technical rule; there is no limitation in courts of justice, that prevents you from applying to them (the facts and circumstances in evidence) just the same rules of good, common sense, subject always, of course, to a conscientious exercise of that common sense, that you would apply to any other subject that came under your consideration and that demanded your judgment."

There was no error in these instructions. One of the main objects of a jury trial is to secure to parties the judgment of twelve men of average intelligence, who will bring to bear upon the consideration of the case the sound common sense which is supposed to characterize their ordinary daily transactions. If cases were to be decided alone by the application of technical rules of law and evidence, it could better be done by men who are learned in the law and who have made it the study of their lives; and while it is entirely true that the jury

are bound to receive the law from the court, and to be guided by its instructions, it by no means follows that they are to abdicate their common sense, or to adopt any different processes of reasoning from those which guide them in the most important matters which concern themselves. Their sound common sense brought to bear upon the consideration of testimony, and in obedience to the rules laid down by the court, is the most valuable feature of the jury system and has done more to preserve its popularity than any apprehension that a bench of judges will wilfully misuse their power. To construe these instructions as authorizing the jury to depart from the rules of evidence and to decide the case upon abstract notions of their own, or from facts gathered outside of the testimony, is hypercritical. They were simply told to come to a conclusion upon the facts that had been proven, and to apply to those facts the same rules of good sense that they would apply to any other subject that came under their consideration and demanded their judgment. In these remarks the court gave a just and accurate definition of their functions. It certainly would have been error to have told them to apply to the facts proven any other rules than those which their good common sense dictated, or to set up any other standard of judgment than that which influenced them in the ordinary business of life.

9. Error is also assigned to the following instruction of the court, upon the subject of obscene publications :

"Now, what is (are) obscene, lascivious, lewd or indecent publications is largely a question of your own conscience and your own opinion ; but it must come — before it can be said of such literature or publication — it must come up to this point : that it must be calculated with the ordinary reader to deprave him, deprave his morals, or lead to impure purposes. . . . It is your duty to ascertain in the first place if they are calculated to deprave the morals ; if they are calculated to lower that standard which we regard as essential to civilization ; if they are calculated to excite those feelings which, in their proper field, are all right, but which, transcending the limits of that proper field, play most of the mischief in the world."

The construction placed by counsel upon this is, that it practically directed the jury that obscene literature was such as tended to deprave the morals of the public *in any way whatever*, whereas the true test of what constitutes obscene literature is that which tends to deprave the morals in one way only, namely, by exciting sensual desires and lascivious thoughts. It is not, however, the charge given by the court that was too broad, but the construction put upon it by counsel. The alleged obscene and indecent matter consisted of advertisements by women, soliciting or offering inducements for the visits of men, usually "refined gentlemen," to their rooms, sometimes under the disguise of "Baths" and "Massage," and oftener for the mere purpose of acquaintance. It was in this connection that the court charged the jury that, if the publications were such as were calculated to deprave the morals, they were within the statute. There could have been no possible misapprehension on their part as to what was meant. There was no question as to depraving the morals in any other direction than that of impure, sexual relations. The words were used by the court in their ordinary signification, and were made more definite by the context, and by the character of the publications which had been put in evidence. The court left to the jury to say whether it was within the statute, and whether persons of ordinary intelligence would have any difficulty in divining the intention of the advertiser. We have no doubt that the finding of the jury was correct upon this point.

10. Error is also assigned to the action of the court in refusing to instruct the jury that the presumption of innocence was stronger than the presumption that the government employés who delivered the newspapers to Mr. Montgomery in the Chicago post office building obtained such papers from the mails; or than the presumption that the person who deposited them in the box in the St. Louis post office building from which box the witness McAfee took the papers obtained them from the mails. The court had already charged the jury "that until the government proves beyond a reasonable doubt that he knowingly caused to be deposited such a publication in the

mails, the presumption of innocence stands between any penalty that the court might inflict, or any verdict that you might pronounce, and the defendant. That presumption of innocence is only overcome when these facts I have named as the gist of the offence are, in your judgment, established beyond a reasonable doubt." The court further instructed the jury that "the presumption of innocence means that it is a presumption of the law that the defendant did not deposit, or cause to be deposited, in the post office for mailing, any of the newspapers admitted in evidence, and this presumption should continue and prevail in the minds of the jury in such a way as to cause them to find the defendant not guilty, unless, from all the evidence in the case, beyond a reasonable doubt, the jury are convinced that the newspapers, or some of the newspapers, admitted in evidence, were deposited or caused to be deposited in the post office for mailing by the defendant." The court made a similar charge with reference to the knowledge of the defendant that the publications contained indecent matters.

The position of the defendant in this connection is that the presumption of the defendant's innocence in a criminal case is stronger than any presumption, except the presumption of the defendant's sanity, and the presumption of knowledge of the law, and that he was entitled to a direct charge that the presumption of the defendant's innocence was stronger than the presumption that the messengers, who deposited these papers in their proper boxes, took them from the mails. If it were broadly true that the presumption of innocence overrides every other presumption, except those of sanity and knowledge of the law, it would be impossible to convict in any case upon circumstantial evidence, since the gist of such evidence is that certain facts may be inferred or presumed from proof of other facts. Thus, if property recently stolen be found in the possession of a certain person, it may be presumed that he stole it, and such presumption is sufficient to authorize the jury to convict, notwithstanding the presumption of his innocence. So, if a person be stabbed to death, and another, who was last seen in his company, were arrested near the spot with a

bloody dagger in his possession, it would raise, in the absence of explanatory evidence, a presumption of fact that he had killed him. So, if it were shown that the shoes of an accused person were of peculiar size or shape, and footmarks were found in the mud or snow of corresponding size or shape, it would raise a presumption, more or less strong according to the circumstances, that those marks had been made by the feet of the accused person. It is true that it is stated in some of the authorities that where there are conflicting presumptions, the presumption of innocence will prevail against the presumption of the continuance of life, the presumption of the continuance of things generally, the presumption of marriage and the presumption of chastity. But this is said with reference to a class of presumptions which prevail independently of proof to rebut the presumption of innocence, or what may be termed abstract presumptions. Thus, in prosecutions for seduction, or for enticing an unmarried female to a house of ill-fame, it is necessary to aver and prove affirmatively the chastity of the female, notwithstanding the general presumption in favor of her chastity, since this general presumption is overridden by the presumption of the innocence of the defendant. *People* v. *Roderigas*, 49 California, 9; *Commonwealth* v. *Whittaker*, 131 Mass. 224; *West* v. *State*, 1 Wisconsin, 209; *Zabriskie* v. *State*, 43 N. J. Law, 640; 1 Greenl. Ev. § 35. This rule, however, is confined to cases where proof of the facts raising the presumption has no tendency to establish the guilt of the defendant, and has no application where such proof constitutes a link in the chain of evidence against him.

In such cases as the one under consideration, it is not so much a question of comparative presumptions, one against the other, as one of the weight of evidence to prove a certain fact, namely, that these papers were taken from the mails. It was a question for the jury to say whether the facts proven in this connection satisfied them beyond a reasonable doubt, and notwithstanding the presumption of innocence, that these papers were taken from the mails; and the abstract instruction requested would only have tended to confuse them, since, if literally followed, it would have compelled a verdict of acquittal.

Upon a careful consideration of the record in this case, we are of opinion that there was no error of which the defendant was justly entitled to complain, and the judgment of the court below is, therefore,

*Affirmed.*