**ZOTTARELLI et al. v. UNITED STATES (six cases).**

Circuit Court of Appeals, Sixth Circuit.

June 7, 1927.

Nos. 4891, 4892, 4895, 4906, 4917, 4944.

**1. Criminal law ⬄1144(13)—Appellate court, on determining sufficiency of evidence to support conviction, must take evidence and inferences therefrom most favorable to government.**

After conviction, Circuit Court of Appeals, in determining whether evidence was sufficient to support conviction, must take that view of evidence, with inferences reasonably and justifiably to be drawn therefrom, most favorable to government, and determine therefrom whether verdict was supported by substantial and competent evidence.

**2. Criminal law ⬄1159(4)—Appellate court cannot weigh evidence, or determine credibility of witnesses, where there was substantial and competent evidence supporting conviction.**

Where there is substantial and competent evidence, which, if believed, will support conviction, appellate court cannot weigh the evidence, or determine credibility of witnesses.

**3. Conspiracy ⬄47—Evidence in prosecution for conspiracy and for substantive offense of selling counterfeit war savings stamps held to sustain conviction (Criminal Code, §§ 37, 151, 154 [Comp. St. §§ 10201, 10321, 10324]).**

In prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to violate sections 151 and 154 (sections 10321, 10324), by passing, publishing, and selling certain counterfeited war savings stamps, and for substantive offenses thereunder, evidence *held* sufficient to sustain conviction.

**4. Counterfeiting ⬄3—Knowlege or belief of counterfeit character is essential element of crime of passing counterfeit United States obligations (Criminal Code, §§ 151, 154 [Comp. St. §§ 10321, 10324]).**

Specific knowledge or belief of counterfeit character is essential element of crime of passing counterfeit obligations of the United States, knowing them to be counterfeit, in violation of Criminal Code, §§ 151, 154 (Comp. St. §§ 10321, 10324).

**5. Conspiracy ⬄47—Conspiracy may be proved by circumstances, and it is unnecessary that defendants know all conspirators.**

Actual conspiracy may be proved by circumstances, nor is it necessary that defendant should have knowledge as to who all members of conspiracy were.

**6. Criminal law ⬄696(7)—Refusal to strike out testimony held not erroneous, where motion covered entire testimony, part of which was competent.**

Where motion to strike out testimony was not limited to any part, but expressly covered entire testimony of witness, part of which was competent, refusal to strike out was not erroneous.

**7. Criminal law ⬄729—Statement of district attorney, later withdrawn on objection, and made the subject of proper instruction in judge's charge, did not constitute error.**

Where district attorney, after remarking relative to finding defendants guilty, so they would not have the same kind of jungle as existed in Canton, Ohio, withdrew statement on objection thereto, and court in its charge gave proper instruction thereon, there was no error.

**8. Criminal law ⬄755½—Trial judge may comment on testimony, and state certain propositions were established, if ultimate questions of fact are left to jury (Criminal Code, §§ 37, 151, 154 [Comp. St. §§ 10201, 10321, 10324]).**

District Judge, in prosecution under Criminal Code, § 37 (Comp. St. § 10201), for conspiracy to violate sections 151, 154 (Comp. St. §§ 10321, 10324), and for substantive offense thereunder, had right to comment pointedly on testimony, and state that certain propositions were established by evidence, so long as ultimate questions of fact were clearly left to jury.

**9. Criminal law ⬄1156(1)—Denial of motion for new trial is not reviewable.**

Discretion of trial judge in denying motion for new trial is not reviewable.

In Error to the District Court of the United States for the Eastern Division of the Northern District of Ohio; John M. Killits, Judge.

Joseph V. Zottarelli and others were convicted of conspiracy to sell certain counterfeited war savings stamps and for committing substantive offense, and they bring error. Affirmed.

Joseph V. Zottarelli, pro se.

William J. Corrigan, of Cleveland, Ohio, for plaintiff in error Salupo.

Walter D. Meals, of Cleveland, Ohio, for plaintiff in error Russo.

Calfee, Fogg & White, of Cleveland, Ohio, for plaintiffs in error.

Miles E. Evans, of Cleveland, Ohio, for the United States.

Before MOORMAN and KNAPPEN, Circuit Judges, and HICKS, District Judge.

KNAPPEN, Circuit Judge. Plaintiffs in error were jointly indicted under Criminal Code, § 37 (Comp. St. § 10201), on a charge of conspiring to violate sections 151 and 154 of that Code (Comp. St. §§ 10321, 10324)— specifically, with intent to defraud the United States and certain banks [trust companies] in Cleveland, Ohio, by passing, publishing, and selling certain counterfeited United States war savings stamps of the series of 1919, and by receiving, transporting, and delivering such stamps to divers persons, with intent that they should be passed, pub-

lished, and used as general obligations of the United States. Each plaintiff in error was also separately indicted upon a charge of committing substantive offenses under Criminal Code, §§ 151 and 154. The cases were consolidated for purposes of trial. Each plaintiff in error was convicted as charged on all the counts, and judgments were rendered accordingly. Each presents separately a writ of error under the conspiracy conviction, as well as writ to review his separate conviction of substantive offenses.

[1, 2] 1. At the close of the testimony counsel for defendants made a "formal motion for the dismissal of actions against" their respective clients. The motion was denied and exception taken. Assuming that the sufficiency of the evidence to support conviction is thereby presented, we pass to its consideration. Under settled rules, we must take that view of the evidence, and the inferences reasonably and justifiably to be drawn therefrom, most favorable to the government, and determine therefrom whether verdict against the defendants might lawfully be rendered, and if there was substantial and competent evidence, which, if believed, would support conviction, the refusal to dismiss must be sustained. We cannot weigh the evidence or determine the credibility of witnesses. Burton v. United States, 202 U. S. 344, 373, 26 S. Ct. 688, 50 L. Ed. 1057, 6 Ann. Cas. 362; Kelly v. United States (C. C. A. 6) 258 F. 392, 406. Plaintiff in error resided at Cleveland, Ohio. Zottarelli was a practicing lawyer, Salupo an undertaker's employee, and Russo's business was foreign exchange, steamship agent, etc. He had a sort of exchange bank.

[3] There was competent, substantial, and undisputed testimony that the stamps which are the subject of these prosecutions were counterfeit. There was also competent, substantial, and undisputed testimony directly and naturally tending to show that all of them were manufactured in Chicago by one Leech; that stamps from this counterfeit plate to the amount of about $15,000 were passed in Cleveland; that about $108,000 came to the department from Chicago, Pittsburgh, and Cleveland, and were redeemed by the government; that $197,000 worth were seized by government agents in Chicago. It is the theory of the government, supported by competent and substantial testimony, that Leech and his associate (one Berino) brought a large amount of these counterfeited stamps to Cleveland, and either directly or through others sold to plaintiff in error, Russo, at 75 cents on the dollar, at least $13,000 thereof (perhaps $15,000), which Russo sold, either

by himself or through others, principally plaintiffs in error Zottarelli and Salupo, and apparently some others. Russo admits purchasing the above amount of stamps at the price stated from (as he says) one La Paglia, who died before the trial below, and one Lombardo, whose identity and whereabouts the government did not succeed in finding. Russo usually equally divided the 25 per cent. discount with Zottarelli or Salupo, as the case might be, both of whom admit dealing with Russo, disposing of stamps, and sharing the 25 per cent. discount. Each plaintiff in error protests his innocence of knowledge or belief that the stamps were forged. The existence of such guilty knowledge is the important question here.

The natural inference from the record would be that each plaintiff in error had reason to believe, when the stamps came into his hands, at least that there was something wrong about them, and that they were either stolen or forged. Government obligations already due need not be discounted. When the stamps came into Russo's hands, and when the deliveries in question were made to Zottarelli and Salupo, the stamps were "loose"; that is, not attached to "folders" or certificates. There was printed on the face of each stamp "Series 1924 —*when affixed to a certificate*,[1] five dollars will be payable January 1, 1924," which would naturally mean on proper presentation and proof.

Under the regulations of the Treasury Department, at the time of the transactions in question here, loose stamps were not generally accepted, at least in large quantities, but were required to be pasted on folders containing a receipt to be signed by or for the holder, as stated in the margin.[2] It also appears that folders were at the period in question, and especially in large quantities, usually unobtainable without a written application, stating, over the applicant's signature, in substance, that the applicant was the original owner of a certain stated number of unaffixed war savings stamps, series of 1919, which have never been affixed to a war savings certificate; also of whom, when, and

---

[1] All italics in this opinion are ours unless otherwise stated.

[2] "Received $——— in payment hereof. I hereby certify that I am the identical person named above and the owner of this certificate; that I am receiving payment on my own behalf and not for any other person." The original receipts contained a statement, in addition, that "I do not hold war savings stamps certificates of this series to an aggregate amount exceeding one thousand dollars." Before the transactions here involved, this limit was raised to $5,000.

where the stamps were purchased. In the case of each plaintiff in error false statements seem to have been made or caused to be made in the application or certificate.

Under the rule already stated, the following situation may properly be accepted for the purpose of *this review of the denial of motion to dismiss*, notwithstanding the denials and explanations offered by defendants regarding some elements of the situation. The method of disposition of the stamps by Zottarelli and Salupo was quite similar. Zottarelli had about $5,700 worth; he collected on 51 stamps (in four transactions) at the post office through his stenographer; through a client, Colucci, 140 stamps; and, with the help of Russo, 839 stamps at the Guardian Trust Company. Salupo had $5,825 worth, he cashed $25 worth (five stamps) at the post office, $800 at the Federal Reserve Bank, and $5,000 at the Lake Erie Trust Company, the latter with the active help of Russo. In each case the course of Zottarelli and Salupo of first selling one or more small amounts at the post office suggests an attempt to feel out the situation, to ascertain whether the stamps would go through all right. In each case there was, as to the large block sales, active participation by Russo. He, for some reason, did not go with Salupo to the Federal Reserve Bank. At the Lake Erie Trust Company he introduced Salupo as Cascetti; the address given by Salupo being the same as the address of Russo's place of business. Salupo, under the name of Cascetti, signed the application, falsely stating therein his ownership and purchase of the stamps. The receipt given by Salupo was also untrue.

In connection with the sale of the stamps to the Guardian Trust Company, Zottarelli represented to a bank official that he could get a fee of $4,000 or $5,000 if he would take his compensation in war savings stamps, and wanted to see if he could make arrangements for handling the stamps, and later brought in and introduced Russo, who had a large package of these loose stamps. These statements from Zottarelli were likewise untrue. The bank obtained folders, with a blank application, which the official filled out October 10, 1924, on information given by Zottarelli, and which was signed by the official in the latter's presence and name. It stated he got the stamps from the post office. When Leech returned to Chicago from Cleveland, he said he had been in Zottarelli's office and talked with some young girl there. Zottarelli told his stenographer that Russo had given him some war savings stamps, a gift of one of

which Zottarelli made her, asking her to take it to the post office and get it cashed. On her return he asked her if she had cashed the stamp, if she went to the post office, how much she got for it, and "Was everything all right?" Later he had her get in all 50 stamps cashed, in four separate transactions, giving her $5 for every 20 stamps she got cashed.

In November, 1924, Zottarelli visited Washington and obtained 25 folders, telling the man through whose kind offices the folders were secured that it took a long time to get them through government channels; that he was the attorney for a savings bank in Cleveland and did a business with the foreign population; that the reason he wanted to get some folders for the banks was that the latter had tried to get them and were being troubled. When the witness gave Zottarelli the 25 certificates, he told him "this here is all I was able to get for you; the government is keeping them kind of off the public—that is, they are not common property any more on account of counterfeiting going on up in Chicago and Pittsburgh." Zottarelli thanked him for getting the folders for him, "because it would show the bank he was on the job, as an attorney; that he was trying to help the bank." This was untrue. When, on his return to Cleveland, Zottarelli was arrested, the 25 folders were found in his bag, as well as one folder with two genuine stamps affixed. In answer to a question why he carried that folder, he said it "was for comparison purposes." There were also found in a drawer in Zottarelli's desk seven loose counterfeited stamps.

In addition to what has already been said as to Russo, he and Salupo stated to the Union Trust Company official that they were getting these stamps from friends; also a contractor at Cleveland, at Russo's request, as a "favor" had $700 of stamps already in folders cashed at the post office; that Russo told him how to fill it out, which he did, then drawing the money and returning it to Russo; that when "they" (presumably the officers) were looking for Russo the latter came to the witness' place at midnight and asked him not to say "those stamps are from me," and when asked "why" said "it was no good." There was testimony that several of the redeemed certificates bore some genuine stamps. The trial judge was impressed that this was done to deceive.[3]

---

[3] In denying motion for new trial, the judge said: "In most instances these [the genuine stamps] were placed in the upper left corner, two or three, followed, in some sheets, by solitary good stamps scattered through the sheets.

[4] While specific knowledge or belief of their counterfeit character is an essential element of the crime of passing counterfeited obligations of the United States, knowing them to be counterfeit (Hagan v. United States [C. C. A. 6] 295 F. 656), considering the testimony in its entirety, as well as inferences properly deducible therefrom, we think it open to the jury to find that plaintiffs in error had knowledge or belief that the stamps were spurious. We are disposed to think that the fact that the first applications were made to the post office, rather than to the banks, has substantial significance, as indicating a belief that the stamps were spurious, rather than stolen. Russo testified that he told the secret service operative (who told him he was wanted for passing counterfeit war savings stamps) that what he had cashed were genuine; that he bought the stamps from Lombardo; that he did not give La Paglia's name, because he was afraid of his life; that he had "heard counterfeiters were pretty bad actors"; that he did not fear La Paglia as a counterfeiter, but, if he "mentioned La Paglia, maybe they would get after me just the same. They would get after me more if I mentioned La Paglia than Lombardo, because Lombardo was a resident of Chicago." It also seems clear that the fact that the stamps were loose tends strongly to show that they were forged, rather than stolen. If forged, they were almost reasonably certain to be loose; if stolen, less likely.

Again, if a large amount of stamps, such as involved here, were stolen, the fact was reasonably certain to be publicly and speedily announced. Banks are usually advised. Forgery is less likely to be immediately discovered. While the counterfeit was so good that the casual or careless observer would easily be misled, there was substantial testimony that to the critical observer the defects were apparent; and critical observation on the part of one buying past-due government stamps at 25 per cent. discount would naturally be challenged. In view of the apparently intimate relations between the plaintiffs in error, including similarity of methods of selling, the jury might well have believed that, whatever one of the conspirators knew regarding the origin of the stamps, all knew. We have already referred to Zottarelli's car-

rying the two genuine stamps "for comparison purposes" (suggesting knowledge or belief that the stamps he was selling were counterfeited), and to the inclusion in some of the redeemed certificates of some genuine stamps. We think there is competent and substantial evidence supporting the conclusion of knowledge or belief of forgery, and that it was not error to submit the case to the jury.

[5] True, there was no direct evidence of an actual conspiracy, but that was not necessary. That offense, as well as any other, may be proved by circumstances. Nor was it necessary that plaintiffs in error should have known who all the members of the conspiracy were, nor that Leech was a member thereof. Rudner v. United States (C. C. A. 6) 281 F. 516, 519, 520, and cases there cited.

[6] 2. The evidence of Olive Meyers: This witness testified to the actual forgeries by Leech, at Chicago, his visit to Cleveland, the sale of stamps, and his statements already referred to. At the conclusion of her testimony counsel for plaintiffs in error moved to strike it out. To say the least, part of it was competent. The motion was not limited to any part, but was expressly extended to the entire testimony of the witness. Plaintiffs in error are not entitled to complain of the refusal to strike out the testimony. West v. United States (C. C. A. 8) 15 F.(2d) 916, 917, and cases there cited.

[7] 3. Argument of the district attorney: Counsel for the government said: "These men should be found guilty, so we do not have in Cleveland the same kind of jungle as exists in Canton, Ohio." Counsel for two of the plaintiffs in error objected to the statement, and asked to note his exception thereto. The district attorney immediately said: "I will withdraw the statement." The court was not requested to make any reference or take any action regarding the incident. On his own motion, however, the judge, in the course of his charge, made reference to the subject in the words quoted in the margin.[4]

---

This practice was identical, as if Zottarelli had completed, with counterfeits, the certificate taken from him, which had two genuine stamps in the upper left corner. There is no possible explanation for this, except for purposes of deception. It is utterly unlikely that genuine and counterfeits were accidentally commingled."

4 "Some exception was taken here (I didn't get all of the language) to a reference to a condition in Canton, where as a matter of newspaper comment, at least—how far it has been substantiated, the court is unable to say—there has been a great disregard for law, some extravagant language has been used, which was excepted to, the exact flavor of which we did not catch. If it had any tendency to draw your minds away from the cold, cool, careful consideration of the facts in this case, it should serve no office at all. And if it were not a proper deduction from situations arguable from the evidence, why, then it has no place in argument. I do not, however, criticize anybody for insist-

We think no reversible error was committed. Remus v. United States (C. C. A. 6) 291 F. 501, 511, 512; Diggs v. United States (C. C. A. 9) 220 F. 545; Dunlop v. United States, 165 U. S. 486, 498, 17 S. Ct. 375, 41 L. Ed. 799.

[8] 4. The charge to the jury is assailed as unfair to the plaintiffs in error, and that its effect was to force a verdict against them, without "regard to whether they had or had no knowledge as to the character of the stamps they dealt in." A careful reading of the entire charge fails to convince us that error was committed. Judicial Code, § 269, as amended by Act Feb. 26, 1919 (Comp. St. § 1246). The judge had a right to comment pointedly upon the testimony, and to state that certain propositions were established by the evidence, if such was the case, so long as the charge was judicial and dispassionate, and so long as the ultimate questions of fact were clearly left to the unhampered judgment of the jury, which we are not persuaded was not the case here. Tuckerman v. United States (C. C. A. 6) 291 F. 958, 964, 965; Russell v. United States (C. C. A. 6) 12 F. (2d) 683, 686. In point of fact, the only question practically open to serious dispute related to the defendants' knowledge or belief of the spurious quality of the stamps.

[9] 5. The discretion of the trial judge in denying the motion for new trial is not assailable on this record. Robinson v. Van Hooser (C. C. A. 6) 196 F. 620, 627.

Finding no error, the judgment of the District Court in each case must be affirmed.

ing, in this day and age, that we should set our faces sternly against infractions of the law and strong for punishment of law breakers, and, the more intensely we feel on that subject, the more careful we should be to see that we do not vent our views on some person as to whom there was a reasonable doubt of his being worthy of our condemnation. We find that our nation is being criticized as being the most lawless nation in the world. The way to suppress crime is to repress it, but we should not lose sight of the safeguards of liberty that are written into our institutions, because we feel so strongly on the subject."