## BLALACK v. UNITED STATES.
### No. 10080.

Circuit Court of Appeals, Sixth Circuit.
April 5, 1946.

L. E. Gwinn and R. G. Draper, both of Memphis, Tenn. (R. G. Draper, D. L. Gerwin, and L. E. Gwinn, all of Memphis, Tenn., on the brief), for appellant.

Doris W. Meenehan, of Washington, D. C., and Thomas C. Farnsworth, of Memphis, Tenn. (William McClanahan and Thomas C. Farnsworth, both of Memphis, Tenn., and Doris W. Meenehan and Nathan Siegel, both of Washington, D. C., on the brief), for appellee.

Before HICKS, ALLEN, and MARTIN, Circuit Judges.

HICKS, Circuit Judge.

Appellant, Blalack, operator of a meat market in Memphis, was convicted on Count II of Information No. 6692, of, on or about June 9, 1945, in Memphis, Shelby County, Tennessee, unlawfully, knowingly and wilfully breaking a veal carcass in violation of Regulation No. 1 of the Office of Economic Stabilization issued and promulgated under the Stabilization Act of 1942 and 1944, being Section 961 et seq., of Title

50 U.S.C.A.Appendix. He was acquitted upon Counts I and III of Information No. 6692. He was convicted upon Information 6710 of unlawfully, knowingly and wilfully storing or retaining in his possession, or possessing several hundred pounds of veal which had not been graded or grade marked in the manner required by the Office of Economic Stabilization Regulation No. 1, promulgated under the Stabilization Act of 1942, etc.

Appellant was sentenced to prison for a period of eight months upon each conviction, the sentences to run concurrently; and was fined $500 on the first conviction and $1,000 on the second.

The evidence tended to show that the City Markets in Memphis consisted of two buildings, the "front" building facing Cleveland Street and a second building facing Market Street, used mostly by farmers. Appellant Blalack maintained two shops in the front building where meat products were sold, and leased storage or "cooler space" in the back building, upon which he paid the rent in June of 1945. On cross-examination he testified that the cooler was across the driveway from the main building where Blalack had his two markets.

James T. Ledbetter, a former business associate of Blalack, testified that the partnership terminated in the early part of 1945, that the big cooler in the processing room was away from the other business and located about 75 feet from the south market and about 200 yards from the other; that after the partnership terminated, there were a lot of matters to close up, and that he always found Blalack "at the office in the north market"; that during the period they were in business together, they had 12 to 16 employees and that they were in and out of the cooler; and that at night as a general rule the man who ran the cooler brought in the key and hung it on a post in the lower market. He never knew of an outsider getting the key, but several times the employees took the key away with them at night. Sometimes, he testified, persons would hang food in there, until a nearby frozen food locker plant opened its doors the next morning. On re-direct examination he made it clear that he was not testifying as to what went on at the market after January 1945, around which time the partnership was dissolved. So far as he knew, no outsider ever had access to the key except through employees.

Dr. George E. Mitchell, Inspector in charge of Meat Inspection for the United States Department of Agriculture, testified that in investigating the interstate transportation of meat on June 1, 1945, he called Samuel P. Penny, Food Inspector of Memphis, and went to the Blalack and Ledbetter market at the south end of the Curb Market and then to the north market, but found no unstamped meats at either. He then asked Blalack, at the north market, if he had any calves coming in. To this, Blalack replied, that he had killed his quota and had difficulty obtaining sufficient meat; that the cooler in the adjacent building was used only for hog carcasses, and that they were not then using it.

Mitchell testified that he and Penny then walked to the cooler and found the door to the room locked; that Penny left and returned with Billy Thomas, one of Blalack's employees, who had the key and unlocked the door. He testified that they found inside two or three veal rounds hanging, and a table full of cut-up meats, steaks and roasts, and a box full of bones and some hides. None of the meat had inspection or grade marks. He estimated that the three half carcasses weighed two hundred and fifty pounds each. The table was pretty well covered with steaks and roasts, and there were a couple of white porcelain pans used in meat stores with some cut-up rounds in one of them. He testified that it was "freshly cut meat" from its appearance, since the exposed surface of cut meat darkens after awhile. He said there were some knives and aprons around; and that he found one package containing a good-sized steak upon the wrapping of which the name "May" was written.

He testified that they tried to see Blalack again that day but were unable to find him; that they put a seal on the cooler and instructed Thomas that it should remain closed and the seals unbroken, that they would return at nine o'clock on Monday morning and requested Thomas to tell Blalack to be there at that time; that Blalack did not appear on Monday and that they entered the cooler about eleven A. M.; that he didn't see Blalack again until Thursday or Friday. When he was asked where he was on Monday morning, Blalack replied, "I was looking for the man, for the fellow, that put the meat in the cooler, looking all over the country."

Mitchell testified that the calf inspection mark is a circle about the size of a half dol-

lar in purple ink and has the words "U. S. Inspected and Passed" with an identification mark to indicate the place of slaughter. Grade marks were in lines a quarter of an inch high, also in purple ink and were "Choice, Good, Utility and Commercial." He denied telling the District Attorney that he believed Blalack had nothing to do with the meat, but stated that Blalack told him that he didn't. He was of the opinion that the north market was not 200 yards but about 250 feet from the cooler.

Penny testified that on June 9th he and Dr. Mitchell inspected both Blalack markets and found everything in shape, finding no ungraded meat. He testified that they asked Blalack about the big cooler across from Blalack's first market and that he replied, "I haven't anything in there at all, I haven't been using it for some time, because I can't get any hogs or anything, it has been laying idle." His testimony was that he and Dr. Mitchell walked straight to the locker, and found it locked, that he returned to get in touch with Blalack and found him at the cash register, and said to him, "Blalack, Doctor Mitchell and I would like to get the keys to go into this big box," and that he replied, "Just a minute" and "then he turned around and walked on around through the market" and that they did not see him again that day.

He testified that Blalack told Thomas to bring the key but that he did not go himself. His testimony as to what was found inside was largely confirmatory of Dr. Mitchell's, and counsel for appellant stated that there was no question about what was inside, that they were not disputing it. Penny testified that they did not see Blalack again that day, that he sent Thomas to find him, and that he returned after twenty or thirty minutes and said, "I don't know where he is gone." They sealed the door and told Thomas to tell Blalack to be there at nine o'clock on Monday morning, but that he was not there and they waited around until ten thirty, when someone came from the south market and offered to crawl through a window and open the door and let them in, and that this was the way they gained admission. The seals were unbroken.

On cross-examination, Penny testified that the key was brought to them voluntarily on the first day. He admitted that in making his periodical inspections of the market, he sometimes found Blalack in, and sometimes away.

W. W. Densford, Supervising Investigator for the Food Enforcement of the Office of Price Administration, testified that he went to the Blalack market on June 11th with Dr. Mitchell and Mr. Penny; that the cooler was sealed and that when it was opened they entered about the same time; that they found some cut-up meats, some calf skins, and some bones from which the meat had been trimmed. He saw one package of meat and testified that inside the wrapping was a piece of paper with the words, "Cosby, $1.25." Inside was a small boneless rump roast. He identified another piece of paper found in the cooler, which bore the notation, "Mr. Mertz, 4 TBStks 3 Qr B Rst Rump." None of the meat that he observed had any grade marks on it. On cross-examination he stated that the papers he referred to were on a work bench or table on which the meat was lying.

This was all the evidence. The court overruled a motion for a directed verdict.

Other questions to be considered to one side, we think the action of the court was correct. As stated by us in Zottarelli v. United States, 6 Cir., 20 F.2d 795, 796, we cannot weigh the evidence but we must take that view of it, and the inferences reasonably and justifiably to be drawn from it, most favorable to the Government and determine therefrom whether a verdict against appellant might have been lawfully rendered and if there was substantially competent evidence which would support the conviction, the refusal of a directed verdict must be sustained. It is unnecessary that the guilt of the accused be shown alone by direct evidence. United States v. Manton, 2 Cir., 107 F.2d 834, 837.

It was established that appellant was the owner of the meat business and controlled two retail meat shops and leased the cooler where the unlabeled meat was found. The cooler was about 75 feet from one market and 250 feet from the other. There is a substantial inference that appellant deliberately absented himself on Monday morning, necessitating a wait at the cooler by the agents for a matter of two hours and finally, entry by way of a window. There were at least three skinned carcasses in the cooler which had been in the process of being cut into roasts, etc. One piece of meat was even wrapped up and had a name and address on it. There was ample evidence of substantial activity

with unlabeled meats on the part of some one. Appellant's employees had access to the cooler and there was no evidence that any one else ever had unsupervised access thereto. There is a strong inference that appellant's employees, then, were working the meat. It is most unlikely that any one of those employees could have used the cooler and have done that volume of butchering without the fact coming to appellant's ears. It is more likely that they were working at appellant's direction. These facts and inferences, coupled with appellant's suspicious conduct at the time Dr. Mitchell and Mr. Penny asked him about the cooler, his absence immediately thereafter, and his inconveniencing absence on Monday morning, when he was asked to be present, supply, we think, competent and substantial evidence to support a conclusion that he had knowledge of what was happening.

Sec. 4002.1 of O.E.S. Reg. 1, issued by Fred M. Vinson, Economic Stabilization Director on August 5, 1943, required in part:

"No person shall * * * store or retain in his possession * * * any beef, veal, lamb or mutton unless such beef, veal lamb or mutton has been graded and grade marked in the manner required by this regulation. * * *"

Sec. 4002.2 thereof required in part:

"No person shall * * * break * * * any * * * veal carcass or wholesale cut unless such carcass or wholesale cut has been identified by grade in accordance with this section. * * *"

Sec. 4002.2(a) (2) required in part:

"Veal carcasses and the wholesale cuts therein contained shall be graded into the following uniform grades: Choice, good, commercial, utility and cull. * * *"

Appellant claims that the Stabilization Acts of 1942 and 1944, 50 U.S.C.A. War Appendix § 961 et seq., under which Regulation No. 1 was issued, were enacted as amendments to the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 901 et seq., and were assimilated to it and subject to limitations set up therein, notably those embodied in the so-called Taft Amendment and codified in 50 U.S.C.A.Appendix, Sec. 902(j), which appellant claims withheld from an administrative agency any authority to "require the grade labeling of any commodity" and that therefore the acts charged were not within the scope of any statute of the United States.

The Taft Amendment was enacted on July 16, 1943 as a specific amendment to Sec. 2 of the Emergency Price Control Act of 1942 as amended, by adding at the end thereof a new subsection, (j). This subsection was re-enacted in identical language on June 30, 1944, as a part of an extensive revision of Sec. 2(a) of the Emergency Price Control Act. The Taft Amendment is quoted in its entirety:

"(j) Nothing in this Act shall be construed (1) as authorizing the elimination or any restriction of the use of trade and brand names; (2) as authorizing the Administrator to require the grade labeling of any commodity; (3) as authorizing the Administrator to standardize any commodity, unless the Administrator shall determine, with respect to such standardization, that no practical alternative exists for securing effective price control with respect to such commodity; or (4) as authorizing any order of the Administrator fixing maximum prices for different kinds, classes or types, of a commodity which are described in terms of specifications or standards, unless such specifications or standards were, prior to such order, in general use in the trade or industry affected, or have previously been promulgated and their use lawfully required by another Government agency."

Appellee answers that this contention of appellant involves an attack upon the validity of a regulation, in that, as claimed, it failed to comply with a statutory condition imposed upon the Price Administrator's authority under the Act, and that such is a matter exclusively for the Emergency Court of Appeals, citing Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 and our case of Shrier v. United States, 6 Cir., 149 F.2d 606, and others.

From an examination of the language of the Price Control and Stabilization Acts, and of the circumstances surrounding their enactment, we are convinced that both contentions are erroneous. The Emergency Price Control Act, enacted January 30, 1942, to check "speculative and excessive price rises, price dislocations, and inflationary tendencies," was directed at commodity prices, including agricultural commodities and rents, and is found in 56 Stat. 23 et seq., and is codified in Title 50, U.S.C.A. Appendix, §§ 901-946, inclusive. Administration was vested in an "Office of Price Administration" under the direction of a "Price Administrator" who was referred to

in the Act as the "Administrator." The Price Administrator was authorized under Sec. 2 of the Act to issue regulations or orders, establishing maximum prices and rents. Secs. 203 and 204 prescribed procedure for determining the validity of price regulations issued by the Administrator under Sec. 2, by protest to and hearing before the Administrator, whose determination was reviewable on complaint to the Emergency Court of Appeals with certiorari to the Supreme Court. The Emergency Court was, on the filing of a complaint before it, given "exclusive jurisdiction to set aside such regulation, order, or price schedule, in whole or in part, to dismiss the complaint, or to remand the proceeding."

Acts in violation of regulations or orders or price schedules were made unlawful and punishable by fine and imprisonment. Jurisdiction of criminal proceedings was vested in the District Courts. It is plain that the Emergency Price Control Act was concerned with the office and duties of the Office of Price Administrator and with no other.

The Emergency Price Control Act was "amended" generally on October 2, 1942 by the Stabilization Act, 56 Stat. 765, 50 U.S. C.A.Appendix § 961 et seq., under the authority of which the Regulation herein involved was issued. Although it is said to "amend" the Price Control Act, the provisions of the Stabilization Act are so diverse, there is no possibility of meshing the two in a manner suggested by appellant's contention. By the Stabilization Act, the President, not the Price Administrator, was authorized to issue a general order stabilizing prices, wages and salaries; and in Sec. 2 thereof was empowered to "promulgate such regulations as may be necessary and proper to carry out any of the provisions of the Act; and may exercise any power or authority conferred upon him by this Act through such department, agency, or officer as he shall direct."

Broadly speaking, the Price Control Act was enacted for the control of rents and commodity prices with authority vested in the Administrator. In the Stabilization Act, the President, not the Administrator, was vested with vast powers for stabilizing prices, wages and salaries. The President was given power to suspend certain sections of the Price Control Act and another section thereof was amended. In Sec. 7(b), the Price Administrator, with certain immaterial reservations, was given the same

powers with respect to functions which might be delegated to him under the Stabilization Act, as he had under the Price Control Act; but there was not one word to indicate that practices and procedures set up by the Price Control Act applied to the powers to be exercised by the President or any other officer to whom he might delegate that power.

No procedure was set up for making protests or complaints as to orders or regulations that the President or other subordinate might issue and in the absence of any express provision in the Stabilization Act, it is inconceivable that a person would be permitted to protest to the Administrator a regulation issued by the President or by someone holding power under him. And yet under Sec. 204(a) of the Price Control Act, such a protest to the Administrator was a prerequisite to filing a complaint with the Emergency Court of Appeals.

■ There was a penalty provision in the Stabilization Act, Sec. 11, but no express vesting of jurisdiction in the District Court, as in the Price Control Act, a further indication that there was blanket jurisdiction in the District Courts of all matters arising under the Stabilization Act, including challenges to the validity of regulations.

Our conclusion is, that the Yakus and Shrier cases do not apply here, and that the validity of the challenged regulation may be considered in this proceeding.

The Regulation in question was issued on August 5, 1943, by the Stabilization Director, whose office was created by the President by Executive Order No. 9250, 50 U.S. C.A.Appendix § 901 note, on the day after the Stabilization Act was enacted. On September 16, 1943, the Director designated the Price Administrator as the enforcing officer for Regulation No. 1, but it is clear from an examination of the order 8 F.R. 12669, that the Price Administrator had only administrative duties with respect thereto. He was expressly denied the power "to change, amend, revoke or rescind" the provisions of Regulation No. 1 and was expressly denied the authority "to issue regulations requiring grade labelling of any commodity."

■ But the Taft Amendment in its subsections 2, 3 and 4 which deal with labelling and standardization imposes limitations on the "Administrator" only, and cannot be construed to apply to other officers of the Government. So far as the limitations of

the Taft Amendment are concerned, the Stabilization Director was free to issue the challenged regulation. Since appellant does not otherwise challenge its validity, we assume that it was legally promulgated.

Appellant complains of the failure of the court to give special requests 8 and 14. No. 8 stated that the jury was not to speculate which of two or more individuals might have been responsible for the acts which constituted the alleged violation. We think the substance of this request was contained in the court's charge that the jury "must be satisfied from the evidence beyond reasonable doubt of the guilt of the defendant" and that it was not error to refuse it.

No. 14 stated that the finding of the meat on the premises and the failure of the defendant to testify were not sufficient to establish the guilt of the defendant beyond a reasonable doubt. The jury was charged that appellant's failure to take the stand would not affect the presumption of innocence. We think the inferences to be drawn from the finding of the meat and the circumstances surrounding the finding were for the jury and it was not error to refuse charge No. 14 which mingled matters which were properly submissible to the jury with a matter which was not.

Appellant claims that it was prejudiced by the opening statement of Government counsel that information had been received that unstamped meat had been "delivered to Mr. Blalack's market out on Cleveland." Defense counsel objected to information that some one had received. The court responded: "Mr. Draper, I don't understand that this is anything more than an opening statement; it is not proof. I think that it is a legitimate statement if you are objecting." Appellant has shown no prejudice. The court stated in the presence of the jury that it was not proof, and that the jury was aware of this is indicated by the fact that it returned a verdict of not guilty on the first count, which charged appellant with having purchased and received unstamped meat.

In argument, Government counsel stated that "the meat was taken and turned over to the Rat Control." Appellant objected, and the court overruled the objection. This statement was but the reiteration of matter contained in the testimony of Mr. Penny, which was received in evidence without objection, that he turned the meat "over to the Rat Control." There was no

return to this theme in the argument, it was an isolated statement of a matter which was already before the jury. Under the circumstances we do not think its utterance was prejudicial. See Max Stephan v. United States, 6 Cir., 133 F.2d 87, 98.

Finally, it is argued that the verdict was void for repugnancy, in that the jury acquitted on the counts which charged the receiving of unstamped or ungraded meat by defendant, but convicted on the counts which charged him with retaining possession of such meat and with the "breaking" thereof in violation of Regulation No. 1. We cannot agree. Count I, as we have already indicated, charged that appellant "did * * * *purchase* and receive" ungraded meat. (Italics ours.) There was no evidence that appellant "purchased" this meat; and a jury verdict of not guilty on that count was not repugnant to a verdict of guilty on the others.

The judgment of the District Court is affirmed.