**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Hobart L. WATSON, Defendant.**

**No. 22617.**

United States District Court
W. D. Missouri, W. D.

Dec. 10, 1968.

---

Calvin K. Hamilton, U. S. Dist. Atty., Anthony P. Nugent, Jr., Asst. U. S. Dist. Atty., Kansas City, Mo., for plaintiff.

Robert G. Duncan, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

JOHN W. OLIVER, District Judge.

Defendant stands accused in four of a ten count indictment of violating Sections 2, 371 and 1461, Title 18, United States Code, A second defendant was named in all ten counts. Count 1 alleged that, in violation of Section 371, the two defendants were parties to a conspiracy to violate Section 1461. Counts 8, 9, and 10 alleged that the two defendants used the United States mail for delivery of nonmailable matter, identified as Issues 10, 11, and 12 of a publication known as "The Swinging Set," which allegedly gave "information, directly and indirectly, where, how, and from whom, and by what means obscene, lewd, lascivious, indecent, filthy and vile matter may be obtained, in violation of Sections 2 and 1461, Title 18, United States Code." [1]

The case went to trial against this defendant alone. The codefendant committed suicide shortly after the indictment was returned. The government consented to the defendant's waiver of trial by jury pursuant to Rule 23 of the Rules of Criminal Procedure. The case was submitted to the Court on a full stipulation of·facts to which numerous exhibits were attached. Neither party, although afforded an opportunity, adduced any oral testimony.

We find the defendant not guilty of all four counts. We now state the reasons for those findings.

### I.

■ Defendant can not be found guilty of the offense charged in Count 1 of conspiring to violate Section 1461 if defendant is not guilty of the substantive offenses charged in Counts 8, 9, and 10 which allege violations of Section 1461.[2]

---

1. The indictment incorporates language from the first and fourth paragraphs of Section 1461. The pertinent parts of the statute read:

   Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance; and— * * *

   Every written or printed card, letter, circular, book, pamphlet, advertisement, or notice of any kind giving information, directly or indirectly, where, or how, or from whom, or by what means any of such mentioned matters, articles, or things may be obtained or made, or where or by whom any act or operation of any kind for the procuring or producing of abortion will be done or performed, or how or by what means conception may be prevented or abortion produced, whether sealed or unsealed; * * *

   Is declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier.

   Whoever knowingly uses the mails for the mailing, carriage in the mails, or delivery of. anything declared by this section to be nonmailable * * * shall be fined not more than $5,000 or imprisoned not more than five years, or both, for the first such .offense, and and shall be fined not more than $10,000 or imprisoned not more than ten years, or both, for each such offense thereafter.

2. We need not discuss ·the legal principles enunciated in cases such as Ingram v. United States, 360 U.S. 672, 79 S.Ct. 1, 314, 3 L.Ed.2d 1503 (1959), because the facts stipulated by the parties are wholly insufficient to sustain a verdict of guilty in regard to Count 1 of the indictment. Defendant Watson was mentioned only five times in the alleged overt acts.

The ultimate question therefore presented is whether, under the particular facts stipulated and the applicable law, the issues of "The Swinging Set" which defendant placed in the mail were "nonmailable matter," within the meaning of Section 1461.

We find that each of the issues of "The Swinging Set" was written and published for the same purpose and designed to reach the same audience. Issue No. 10, identified in Count 8, states, somewhat leeringly, that it is "an adult publication" and that "you must be 21 years old to read this!!! "[3] On the front page it states the following: "WARNING * * * It is unlawful to send obscene letters, photographs, or other materials through the mail. We cooperate to the fullest extent with the Post Office Department." A letter to "Dear Fellow-Swingers" published in one of the indicted issues advises that "The Swinging Set" began in the Fall of 1966 as a three page mimeoed bulletin without pictures," that nine issues had been since published, each larger than the last, and that pictures had been added in Issues No. 8 and 9. It was claimed that the publication

reached 5,000 "Swingers" and that a staff of 4 forward all letters on the same day received.

No evidence was adduced as to how many people actually received each issue but it is reasonable to assume that at least everyone who placed an ad received a copy. The issues average 21 pages and most pages carry eight or nine individual ads (all the issues carry advertisements of other publications similar to "The Swinging Set").

The communication pattern adopted by "The Swinging Set" harks back to the pattern established by more familiar lonely heart clubs. An individual places an advertisement in the publication, with or without a picture, for a $2 fee and is assigned a code number. One receiving the publication may answer the advertisement by writing a letter to the code number in the advertisement, sending that letter to a post office box rented by defendants, together with $1 as a fee to have his first letter forwarded. The fee for forwarding additional letters was 50¢. Subscription rates were $3 for a six issue subscription.[4]

---

The stipulation establishes the allegations of Paragraphs 6, 17 and 19 of the overt acts that defendant Watson did insert a personal ad in Issue No. 6 of "The Swinging Set," that he did use Post Office Box 203 at the Independence, Missouri Post Office for receipt of mail addressed to "The Swinging Set," and that he used Postal Meter No. 851882.

No other allegation of Count 1 concerning defendant Watson was established by the stipulation. The allegation that defendant Watson used the mail for a letter addressed to an individual in Wichita, Kansas was not established by any evidence; indeed, paragraph 19 of the stipulation identifies the only letter of that date in evidence and it is stipulated that a person other than either defendant mailed that letter. Paragraph 20 of the overt act portion of Count 2 alleges that defendant Watson sent Issue No. 10 to an individual in Independence, Missouri. The stipulation shows that such issue was sent to an individual in Morton, Kansas. More important, the stipulation does not cover the requisite factual situation present in every Section 371 conspira-

cy case as to whether (a) the deceased defendant and alleged co-conspirator Wunsch did or did not commit any of the overt acts alleged in Count 1; and (b) defendant Watson had any knowledge of such acts whatsoever. In short, the stipulation was prepared and this case was presented on the theory that the defendant Watson was being tried for substantive Counts 8, 9, and 10, and that consideration of Count 1 went by the board with defendant Wunsch's death.

3. The implicit suggestion of that nonsense is comparable to the pitch many have heard carnival barkers make from the outside platform of the tent in which the dancing girls performed.

4. The publication also carried advertisements for membership in similar clubs, such as "Select Magazine," published in Camden, New Jersey; "The Group," published in Los Angeles, California; "La Plume," published in Brooklyn, New York; "Clique," published in Colorado Springs, Colorado; and "Ecstasy," published in York, Pennsylvania.

An ad placed by defendant in his own publication is typical of many of the other ads published. Defendant's ad in Issue No. 10 read:

K. C. Couple ages 29 & 39, would like to meet like-minded couples in area. She is AC/DC so you gals write too. No drinkers please. 2033.

The stipulation sets forth a glossary of the terms used in "The Swinging Set" and other like publications. Particular words, apparently not considered by the Post Office to be obscene when given their usually accepted meaning, have nevertheless been considered to have acquired a secondary meaning when used in publications such as "The Swinging Set."[5] There can be no doubt that this is true in regard to a particular—although unidentified segment of the society in which we live.

Exhibit 14, a letter addressed to "Dear 2033," defendant's code number, was an answer to the defendant's ad and illustrates the sort of response the defendant must be found to have known might be written in answer to the type of ad he had personally placed in his own publication.[6] The couple who answered defendant's ad gave their ages, height, and weight and stated "We are both totally uninhibited and shock-proof so if you care to answer our letter, we will answer any and all questions frankly and truthfully." They also stated an interest in "home movies" and "photographs," stating that they had a "wonderful collection of photos of ourselves, and friends that we have partyed [sic] with."[7]

The responding letter continued: "If you answer our letter we will send an action photo of ourselves in our next letter." (An "action photo" is stipulated to mean "pictures of sex acts"). This statement is similar to the few other responding letters which are in evidence. The responding letter closed with the statement: "We hope to hear from you soon so that we may write on a less formal basis."

Exhibit 9 is a letter from the defendant to a couple in Wichita, Kansas, who had already answered defendant's ad. Reference to that letter will serve to illustrate how correspondence initiated by contacts established by placement of ads in "The Swinging Set" at least sometimes progressed. Defendant stated in his reply to the response received from his ad that "We received your answer to

5. Applying the glossary definitions to defendant's ad we find that "AC/DC" means that the "person engages in sex acts with either sex." "Frank correspondence," used in another ad placed by defendant, is to be understood to indicate that the advertiser is interested in a letter about "sex acts, containing nude photos or photos of sex acts."

6. There are an insufficient number of responses in evidence either to the defendant's own ads or the ads of others to make any definitive finding in regard to the sort of response that would inevitably be made by persons answering ads in the Swinging Set. Nevertheless, we believe that it can fairly be said that defendant knew the ads he published were designed for the purpose of producing, and that they would likely produce, responses which were similar to that response defendant received to his own ad.

7. Application of the stipulated glossary teaches that use of the word "photographs" is to be considered to mean the "taking, collecting, developing or exchange of nude photos or photos of sex acts." "Party" means "meeting for sexual purposes." "Home movies" means "movies of persons engaged in sex acts."

The dismal sort of films are described in Chapter 10 of Kuh: "Foolish Fig Leaves? Pornography In—and Out of —Court," (MacMillan Co., N.Y.1967), as "filthy, bawdy muck" within the definition of D. H. Lawrence, as stated in his famous essay "Pornography and Obscenity," republished in Lawrence's "Sex Literature and Censorship," 69 (1959). Lawrence's definition is quoted by Mr. Justice Frankfurter in Kingsley Intern. Pictures Corp. v. Regents of University of State of New York, 360 U.S. 684, at 692, 79 S.Ct. 1362, 1367, 3 L.Ed.2d 1512 (1959). Mr. Justice Frankfurter also stated that D. H. Lawrence agreed that "there was such a thing as pornography, dirt for dirt's sake, or, to be more accurate, dirt for money's sake," an idea which echoed the Chief Justice's comment in his concurring opinion in Roth v. United States, 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).

our ad in The Swinging Set" and described that response as "a very nice letter—and very interesting." Defendant described himself in quite ordinary language, advised that he owned a Polaroid camera and cautiously stated that "We are interested in things you mentioned in your letter." What, if anything, resulted from the correspondence is not revealed by the evidence.

The parties agreed in paragraph 17 of the stipulation that particular exhibits "originated with or came into [the defendant's] possession during the time he was an advertiser, member and correspondent in sex-oriented pen-pal clubs." Those exhibits, 8 through 18, inclusive, consisted of five publications quite similar to "The Swinging Set" published elsewhere in the United States (see footnote 4 above), and seven letters to or from the defendant or his code number similar to Exhibits 14 and 9 above described. Although various words set forth in the glossary are used throughout that material, none of the exhibits could properly be classified as "nonmailable" in the sense that they are "obscene" when viewed in light of the applicable tests stated in *Roth*. The government does not contend otherwise in the briefs and arguments presented in this case.

Paragraph 18 of the stipulation states that exhibits 19 through 34, inclusive, were "items that came into the possession of [the defendant] during the time he was associated with the [co-defendant] in the printing, mailing, advertizing, promotion and operation of, the enterprise known as 'The Swinging Set'."

Because it is agreed that all exhibits identified as stipulation exhibits Nos. 1 through 34, inclusive, in fact "came into the possession of the defendant," we find that he is charged with knowledge of the contents of that material. (Paragraphs 10 through 16 of the stipulation identified issues Nos. 6 through 12 of "The Swinging Set" as stipulation exhibits 1 through 7, inclusive; defendant obviously must be found to have had knowledge of the contents of the issues of "The Swinging Set" which he helped publish).

We must, however, make the same finding in regard to Exhibits 19 through 34, inclusive, covered in paragraph 18 of the stipulation, as that made in regard to the exhibits identified in paragraph 17 of the stipulation. The exhibits identified in paragraph 18 cannot properly be classified as "nonmailable" because they cannot be declared to be "obscene" under the applicable *Roth* test.

The paragraph 18 group of exhibits included various applications for membership, which contained the ads later published in particular issues of "The Swinging Set." Also included were five letters similar to those contained in the paragraph 17 group described above. The government has neither alleged nor contended that any of the issues of "The Swinging Set" are obscene *per se*. Nor did it allege or attempt to prove that the original applications from members which contained ads later published were obscene. The same thing is true of the letters written to or by the defendant. We must therefore find that none of exhibits 1 through 34, inclusive, of which it is agreed that defendant had knowledge, were obscene.

A different situation exists in regard to the exhibits identified in Paragraphs 19 through 29 of the stipulation, exhibits 35 to 45, inclusive. Those exhibits are in a category different from the exhibits thus far discussed. It is not agreed, however, nor did the government make any attempt to prove, that defendant ever had any actual or constructive knowledge of any of the ten particular letters identified in paragraphs 19 through 29, inclusive, of the stipulation. Each of the letters so identified shows on its face that it was written directly from one person to another; there is no evidence that any of those letters ever came into the possession of the defendant or were ever read by him.

The only agreement made in the stipulation concerning each of those letters was that one of the correspondents had a code number in some issue of "The Swinging Set." Examination of those stipulated code numbers, however, shows

that only five of those code numbers appeared in issues Nos. 10, 11, and 12, identified in the three counts of the indictment. The most that could be said of the government's evidence is that the three questioned issues of "The Swinging Set" involved in this case gave the names, by way of code number, of five persons from whom someone answering their respective ads in those issues might, at some future time, obtain obscene matters through the mail.

The evidence shows, however, that only one letter in that group of five, exhibit 41, can be classified as obscene. While two are quite close to the line, the other two clearly could not properly be declared obscene under the *Roth* test. One of the letters, clearly not obscene, for example, exhibit 39, was a form letter from "The Swingers Go-Go Club" of San Francisco, purportedly composed of "girls [who] are former models and show girls." The sample photograph enclosed was not obscene. There was no evidence whether the set of photographs offered for sale was or was not obscene.

The long and short of the government's obscenity evidence was that issue No. 11 of "The Swinging Set" gave information about a "Blonde, 41 [who] looks and acts like 21" with code number 1118 who did in fact send an obscene letter to a couple in Oklahoma City in December of 1967. That letter shows on its face that the correspondents had been writing each other for some time. We believe it would be fair to assume that the person with code number 1118 might send other obscene letters to other people with whom she became acquainted through her "Swinging Set" ad. But the difficulty, so far as the evidence in this case is concerned, is that the government did not even attempt to show that the defendant knew anything about the matters which code number 1118 had or had not put in the mail after she has been in correspondence with some one who answered her ad as it appeared in issue No. 11 of "The Swinging Set."

There is a total absence of proof in regard to defendant's knowledge of any of the ten letters identified in paragraphs 19 through 29. The fact that the defendant readily agreed that all the exhibits identified in paragraphs 17 and 18 had come into his possession but refused to agree that he had any knowledge of the ten letters exchanged by club members who may have become acquainted through "The Swinging Set" is not without legal significance.

All the correspondence in evidence which contained photographs or language which could be adjudged obscene within the meaning of Section 1461 show on their face that the parties had been corresponding for some time. We find that no obscene letters or matters were placed in the mail in any initial letter which responded to an ad placed in any issue of "The Swinging Set" identified in the indictment. This is true, not only in regard to the three issues in question but it is also true in regard to answers to ads which appeared in earlier issues of that publication which are in evidence. We also find that the government did not prove that the defendant ever had any knowledge of any obscene matter introduced in evidence in this case.

We believe, however, it apparent from the evidence that it is entirely likely that the particular segment of our society which places and answers advertisements in publications such as "The Swinging Set" includes an appreciable number of persons who are quite likely to be persons who might at some future time, particularly after the exchange of several letters, place nonmailable matter in the United States mail.

The most that the government proved, however, was that "The Swinging Set" published ads of persons who might, apparently after a bit of preliminary correspondence, put nonmailable matter in the mail. The legal question presented is whether the publication of the ads of such persons constitutes a violation of the fourth paragraph of Section 1461. We do not believe that Section 1461 can be construed so broadly for reasons we now state.

## II.

This case does not involve any question of whether publications such as "The Swinging Set" should or should not be censored. Neither this Court nor any other federal court is authorized by law to serve as a censor for any publication, including, but not limited to, publications such as "The Swinging Set." Nor is the prosecution of this case based upon the same provisions of Section 1461 which were involved in the familiar recent decisions of the Supreme Court. Those cases presented questions which involved indictments under the first paragraph of Section 1461; the case at bar involves an indictment under the fourth paragraph of that section.

The Supreme Court held in *Roth* that the Congress possesses and has lawfully exercised power, in the first paragraph of Section 1461, to declare that particular matters found to be "obscene, lewd, lascivious, indecent, filthy or vile" are to be considered "nonmailable" and that the mailing of such matters is a violation of that particular paragraph of that section. Paragraph four of that section relates solely to advertisements which relate to obscene material.

*Roth* simply determined that "obscenity is not within the area of constitutionally protected speech or press." (354 U.S. at 485, 77 S.Ct. at 1309).[8] And *Roth* made clear that because "sex and obscenity are not synonymous" (354 U.S. at 487, 77 S.Ct. at 1310), discussion of sex as a matter of public concern, under principles stated earlier in Thornhill v. Alabama, 310 U.S. 88, 101, 60 S.Ct. 736, 84 L.Ed. 1093 (1940), was within the

protection of "the freedom of speech and of the press guaranteed by the [First Amendment of the] Constitution." (354 U.S. at 488, 77 S.Ct. at 1310).

Indeed, *Roth* commanded that courts maintain a "ceaseless vigilance * * * to prevent * * * erosion by Congress or by the States [of] the fundamental freedoms of speech and press [which] have contributed greatly to the development and well-being of our free society" (354 U.S. at 488, 77 S.Ct. at 1311).[9]

The question presented in an obscenity case prosecuted under the first paragraph of Section 1461 is not whether a particular publication discusses sex; the question is whether the manner in which sex is discussed, measured in light of the test announced in *Roth,* may be said to take a particular publication outside the protection of the First Amendment.[10] The test which the majority in *Roth* held could be constitutionally applied in a prosecution based on the first paragraph of Section 1461 was one which inquired "whether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest" (354 U.S. at 489, 77 S.Ct. at 1311). Neither the validity of the *Roth* test nor the application of that test is involved in this case. The prosecution of this case is based on the fourth, not the first, paragraph of Section 1461.

It is quite apparent that the government's prosecution of this case is based on the notion that if the evidence adduced shows that the defendants were engaged in what the government de-

---

**8.** The question presented in *Roth* was an extremely narrow one. It related solely to the constitutional question presented. The Court made clear that "no issue [was] presented * * * concerning the obscenity of the material involved."

**9.** The Court emphasized in *Roth* that "the door barring federal and state intrusion into this area cannot be left ajar; it must be kept tightly closed and opened only the slightest crack necessary to prevent encroachment upon more im-

portant interests." (354 U.S. at 488, 77 S.Ct. at 1311).

**10.** *Roth* explicitly held that standards stated in Regina v. Hicklin, (1868) L.R. 3 Q.B. 360, which permitted a publication to be adjudged obscene if isolated passages of material legitimately treating with sex had an adverse effect upon particularly susceptible persons could not be constitutionally applied in any court bound by the Constitution of the United States.

scribes as a "pimping-by-mail enter-prise" that the defendant must be found guilty of placing "nonmailable matters" in the mail when he mailed the three issues of "The Swinging Set" identified in the indictment.

The government expressly concedes that the majority in Ginzburg v. United States, 383 U.S. 463, 86 S.Ct. 942, 16 L.Ed.2d 31 (1966), authoritatively determined that "the fact that petitioners * * * profited from the sale of publications" does not afford a basis of conviction for the reason that "to sanction consideration of this fact might indeed induce self-censorship, and offend the frequently stated principle that commercial activity, in itself, is no justification for narrowing the protection of expression secured by the First Amendment" (383 U.S. at 474, 86 S.Ct. at 949). Upon what then does the government's theory depend?

The government contends that the language of Ginzburg which made use of the word "pandering" must be read in a manner which would make defendant's alleged "pimping-by-mail enterprise" unlawful within the meaning of the fourth paragraph of Section 1461. "Pimping-by-mail" is equated with "pandering" and the government contends that the construction impliedly placed on the first paragraph of Section 1461 in Ginzburg authorizes prosecution of such an enterterprise under the fourth paragraph of that statute.

There can be no doubt that the majority opinion in Ginzburg made use of the word "pandering" many times. See 383 U.S. at 470, n. 11, 471 (two references), 472, 472, n. 14, 473, 474, 86 S.Ct. 942, for examples.[11] It is obvious, however, that the majority in Ginzburg was not using the word "pandering" in any technical legal sense. The offense of pandering, for example, is defined in

V.A.M.S., § 563.010. That statute of Missouri provides:

That any person who procures a female inmate for a house of prostitution; or who shall induce, persuade, encourage, inveigle, or entice a female person to become a prostitute; or who, by promises, threats, violence or by any device or scheme, shall cause or influence a female person to become an inmate of a house of prostitution, or assignation, or any place where prostitution is practiced, encouraged, or allowed; or any person who shall by threats, violence or oppression cause an inmate of a house of prostitution or place of assignation to remain therein as such inmate, or any person who by promises, threats, violence, fraud or artifice, or by abuse of any position of confidence or authority shall cause or influence any female person to enter any place within this state in which prostitution is practiced, encouraged, or allowed, for the purpose of prostitution; or who shall inveigle, entice, persuade, encourage, or procure any female person to come into this state or to leave this state for the purpose of prostitution or who shall take or detain a female with intent to compel her by force, threats, menace or duress to marry him or to marry any other person or be defiled; or who shall upon the pretense of marriage take or detain a female person for the purpose of sexual intercourse; or who shall receive or give, or agree to receive or give any money or thing of value for procuring or attempting to procure any female person to become a prostitute or to come into this state or leave this state for the purpose of prostitution shall be guilty of pandering, and upon conviction shall be punished by a fine of not less than one hundred dollars nor more than one thousand dollars or by imprisonment in the penitentiary for a term of not less than two years nor more than five years.

11. In addition to repeated use of the word "pandering" the majority in Ginsburg also used expressions such as "titillation by pornography" (383 U.S. at 471, 86 S.Ct. 942) and the "leer of the sensualist" (383 U.S. at 468, 86 S.Ct. 942).

Similar statutes exist in most of the States and the ordinances of many cities, towns, and villages contain similar prohibitions. Legislative efforts to stamp out the world's oldest profession and those who exploit the professionals are almost as old as the profession itself. We think it obvious that when the majority opinion in *Ginzburg* used the word "pandering" it was not referring to any of the many State statutory offenses illustrated by the Missouri pandering statute. Mr. Justice Brennan did, of course, use that word in describing the business in which the *Ginzburg* defendants were engaged. He said they were in the "sordid business of pandering." As the text of the majority opinion in *Ginzburg* shows, however, (383 U.S. at 467, 86 S.Ct. 942) he was simply using a shorter description than that used by the Chief Justice to describe the business in which the *Roth* defendants were engaged. Chief Justice Warren said that the defendants in *Roth* were in "the business of purveying textual or graphic matter openly advertized to appeal to the erotic interest of their customers" (354 U.S. at 495–496, 77 S.Ct. at 1315).[12]

It must be noted at the outset that the government did not allege that the three issues of "The Swinging Set" were obscene. Nor did it allege that the defendant violated the first paragraph of Section 1461 when he placed those three issues in the mail. The government's "pimping-by-mail" and "pandering" contentions are not tenable because the Court used that language in *Ginzburg* simply to elaborate the test announced in *Roth* to determine the obscenity *vel non* of matters alleged to be nonmailable within the Congressional declaration set forth in the first paragraph of Section 1461. See 383 U.S. at 474 and 475, 86 S.Ct. 942.[13] Such an issue is not presented by the indictment filed in this case.

### III

The sole charge made against the defendant in paragraphs 8, 9, and 10 of the indictment is that the three issues of "The Swinging Set" were "nonmailable" in that they allegedly gave "information, directly or indirectly, where, how and from whom, and by what means obscene, lascivious, indecent, filthy and vile matter may be obtained, in violation of the [fourth paragraph] of section 1461, Title 18, United States Code."[14]

The government contends that proof which could be said to establish that a relative few of the individuals who placed or answered ads in "The Swinging Set" eventually deposited nonmailable matter in the United States mail is sufficient to support a conviction under the fourth paragraph of Section 1461 as most recently construed in *Ginzburg*.

12. The context within which the Chief Justice used his description in his concurring opinion in *Roth* was to support his thought that in an obscenity case "it is not the book that is on trial; it is a person. The conduct of the defendant is the central issue, not the obscenity of a book or picture." (354 U.S. at 495, 77 S.Ct. at 1314). We are confident that the Chief Justice would be the first to say that those words should not be taken to mean that one accused of a violation of Section 1461 may be convicted for any conduct other than placing a matter lawfully declared by Congress to be "nonmailable" in the United States mail.

13. The caveat stated: "It is important to stress that this analysis simply elaborates the test by which the obscenity *vel non* of the material must be judged"

(383 U.S. at 475, 86 S.Ct. at 950). And on page 474 of 383 U.S., on page 949 of 86 S.Ct., the majority further explained that "we perceive no threat to First Amendment guarantees in thus holding that in close cases evidence of pandering may be probative with respect to the nature of the material in question and thus satisfy the *Roth* test."

14. *Luros v. United States* (8 Cir. 1968) 389 F.2d 200, primarily involved a prosecution under the first paragraph of Section 1461. We read the "pandering" language in Judge Lay's opinion in that case in the same manner as we read the similar language in *Ginsburg*. The Government apparently recognizes that *Luros* is not apposite to this case because it neither cites nor relies on that case.

On page 5 of its trial brief, the government suggests that:

> All issues of *The Swinging Set* and Watson's own *The Modern Swingers*, (Exhibit No. 30), contain numerous frankly worded propositions for meetings with other persons for sexual purposes, including clear offers of old-fashioned prostitution. Double entendre words and phrases abound, but in a context replete with point-blank solicitations and invitations to sexual meetings one can justifiably disregard the innocent interpretations of double meanings. Unquestionably defendant Watson knew exactly what was being offered and sought. He and Wunsch for a fee provided the means of contact and communication between correspondents. Clearly, theirs was a pimping-by-mail enterprise.

The government contends that proof of those facts makes clear "the fact that [defendant] advised others by mail, where, how, and from whom and by what means obscene, lewd, lascivious, indecent, filthy, and vile matter might be obtained" and that "this operation was a direct violation of the fourth paragraph of 18 U.S.C. 1461."

The government relies principally on United States v. Zuideveld (7 Cir. 1963) 316 F.2d 873, cert. den. 376 U.S. 916, 84 S.Ct. 671, 11 L.Ed.2d 612 (1964).

*Zuideveld* is clearly distinguishable from the case at bar. That case involved a single count conspiracy indictment under Section 371 to violate Section 1461. In *Zuideveld,* some thirty individual defendants were indicted together with forty-two other individuals who were named as non-defendant co-conspirators. That case is comparable to this only in that the advertisements identified in *Zuideveld* concerned a pen-pal club which were published in "Vim" and "Gym", two magazines catering to homosexuals, which could not, under controlling Supreme Court decisions, be held to be obscene *per se.* The majority opinion stated that the record in *Zuideveld* made crystal clear that "the widespread exchange of admittedly obscene materials through the mails was between defendant club member conspirators themselves and with others and it arose directly from their membership in The Adonis Male Club. *The record is replete with direct evidence showing the wide extent of such correspondence and the admittedly vile nature of the obscenity.*" [316 F.2d at 878].

Quite unlike this case, the individuals who actually wrote the obscene letters were joined in the Section 371 conspiracy indictment as co-defendants and non-defendant co-conspirators with two of the defendants who merely "promoted the club and kept it running through the techniques of mailing new names each month to the club member conspirators." [15]

15. *Zuideveld* was decided May 1, 1963. United States v. Redmond (6 Cir. 1966) 355 F.2d 446, reached the Supreme Court on May 28, 1966. In Redmond v. United States, 384 U.S. 264, 86 S.Ct. 1415, 16 L.Ed.2d 521 (1966), the Court granted certiorari and at the same time granted the Solicitor General's motion that the case be remanded for eventual dismissal on the ground that the initiation of the prosecution was not in accord with policies formulated within the Department of Justice which were stated in a memorandum to United States Attorneys, dated August 31, 1964. The facts in *Redmond* involved the transmittal of obscene photographs from a couple to a club for "broadminded persons" which operated under the name of "Identification."

The Department of Justice memorandum of August 31, 1964 played a part in a similar dismissal of Cox v. United States (9 Cir. 1967) 370 F.2d 563. The two defendants in that case "became friendly through an exchange of correspondence, and Cox gratuitously mailed to McGuire sealed envelopes containing photographs which are not denied to be obscene." The Department of Justice, after inquiry had been made of the Solicitor General, moved that the Ninth Circuit remand the case with an order to dismiss. That memorandum pointed out that "It should be noted that, to our knowledge, there has been no appellate review of convictions based on consensual, obscene private correspondence of a noncommercial nature in which the

The problem of proof in connection with the conspiracy charge involved in *Zuideveld* was reduced to whether a late joining conspirator was to be held criminally responsible for the acts of co-conspirators who had, during the course of the conspiracy, admittedly deposited non-mailable matter in the mail. The problem of proof in this case obviously is much more exact. The government must prove beyond reasonable doubt that the particular issues of "The Swinging Set" were nonmailable or else gave "information, directly or indirectly, where, or how, or from whom, or by what means any [obscene] matters * * * may be obtained," within the meaning of the fourth paragraph of Section 1461.

The Supreme Court has held that even in civil proceedings begun by the Post Office, the government must prove that "the publisher *knew* that at least some of his advertisers were offering to sell obscene material." Manual Enterprises, Inc. v. Day, 370 U.S. 478, 82 S.Ct. 1432, 8 L.Ed.2d 639 (1962). Compare Smith v. California, 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959).

■ Application of the rationale of *Manual Enterprises* requires that a publisher of a pen-pal club bulletin can not properly be convicted under paragraph four of Section 1461 without proof beyond reasonable doubt that such publisher knew that at least some of his advertisers could and would put some sort of obscene matter in the mail in response to the advertisement published.

■ The most that publication of the coded ads could be said to do, looking at the evidence most favorably to government (a view inconsistent with the duty of the trier of the facts in a criminal case), was to make available the names of a number of people, a few of whom have been shown to have the capacity and inclination to put nonmailable matter in the mail at some future time. The government did not establish that the defendant had any knowledge of the matter which may be said to be obscene. The government therefore failed to prove a violation of paragraph four of Section 1461.

■ The language used by Judge Swygert in his dissent in *Zuideveld*, although used in the context of a conspiracy case, is applicable for the reason that it related to what he believed was a failure of proof.[16] It would, of course, be naive to suggest that individuals who placed and answered ads in "The Swinging Set" represented an exemplary segment of the general community. But it is quite a different thing to say that the government has established beyond reasonable doubt that the publisher of "The Swinging Set" knew that he was giving information where, or how, or from whom one could obtain obscene matter if he placed or answered an ad in that publication. Judge Swygert suggested all the evidence adduced in a one month conspiracy trial was not sufficient even to establish the basis for sustaining a Section 371 conspiracy conviction. He

constitutional issues have been raised and resolved," and directed attention to Judge Moore's dissent in United States v. Darnell, (2 Cir. 1963) 316 F.2d 813, cert. den. 375 U.S. 916, 84 S.Ct. 205, 11 L.Ed. 2d 155 (1963).

The reason why club members have not been joined as either co-defendants or co-conspirators in prosecutions instituted since 1966 is not important; the juridical fact that club members are not joined as co-defendants or co-conspirators is of considerable legal significance as noted in the text.

16. The quantum of proof necessary to support a conspiracy conviction to violate Section 1461 is obviously much less than

that required to sustain a conviction for violation of Section 1461 itself. In a conspiracy case proof that a co-conspirator had, during the course of the conspiracy, violated Section 1461 is sufficient to convict if it is established that the defendant knew that his co-conspirators were in fact engaging in criminal correspondence. Such proof obviously would not be sufficient in a prosecution for a substantive violation of Section 1461 because it must be established beyond a reasonable doubt that the defendant had knowledge that the members of a particular pen-pal club possessed and would in fact place obscene matters in the mail.

stated that "the Government's evidence of a conspiracy hinges on an unwarranted inference that ought not be used to sustain its burden of proof beyond a reasonable doubt." He added:

That inference or assumption of necessity is that any association of homosexuals wherein correspondence by mail is anticipated will result in the transmission of obscene materials. * * * the creation of a "pen pal" club among homosexuals is not *per se* an infraction of the law * * * [A]n assumption that homosexuals will inevitably indulge in obscenity if invited to correspond with one another through the aid of a "pen pal" club is no more valid than an assumption that one who establishes a so-called "lonely hearts" club among men and women thereby invites and promotes the transmission of obscenity through the mails. [316 F.2d at 882].

It was Judge Swygert's view that "without indulging in this underlying assumption there is * * * no substantial proof that the Zuidevelds conspired with * * * members of the Adonis Male Club to exchange obscene materials."

We recognize that the obvious purpose of this prosecution was to stop the publication of "The Swinging Set" for the reason that it was the vehicle that enabled persons who possess what most would agree are irregular sexual tastes from finding out with whom they may correspond on a consensual basis. A possible additional motivation of the prosecution was to prevent the acquaintance of persons who, if they became acquainted, would willing violate any number of existing state laws.[17]

The difficulty, however, is that the Congress did not even indicate that it intended for the federal government to enter into the regulation of the morals of all the people of the United States when it passed Section 1461. It concerned itself only with what matters could or would be put in the United States mail. It, in effect, adopted Anthony Comstock's theory that if matters which he considered to be obscene were, to use another of Comstock's favorite words, "suppressed" (he called his organization which received one-half of all fines levied in New York "The New York Society for the Suppression of Vice"), all temptation would be removed from sight and that all persons would thereafter be moral.[18]

Some of the early cases, uninhibited by any consideration of protection afforded speech and press by the First Amendment, produced what look to us today as almost unbelievable results. Dunlop v. United States, 165 U.S. 486, 17 S.Ct. 375, 41 L.Ed. 799 (1897), a case relied upon and which the government cites in this case, for example, affirmed the conviction of the publisher of a daily newspaper in Chicago because the personal column in the want ad section carried, to use the Court's guarded language, "advertisements by women, soliciting or offering inducements for the visits of men * * * under the disguise of 'Baths' and 'Massage,' and oftener for the mere purpose of acquaintance."[19]

---

17. We so gather from the government's description of "The Swinging Set" as a "pimping-by-mail enterprise."

18. The portion of Comstock's "Traps for the Young" (1883) set forth in Appendix I to Mr. Justice Douglas' dissenting opinion in Ginsberg v. New York, 390 U.S. 629 at 656, 88 S.Ct. 1274, 20 L.Ed.2d 195 shows that Comstock directed his fire against the "vile illustrated weekly papers" and "a large variety of half-dime novels, five and ten cent story papers, and low priced pamphlets for boys and girls." While it is true that on other fronts Comstock attacked many things that he believed to be vice, he used tools other than legislation in the pattern of Section 1461 to do so.

19. The jury was instructed to convict if those advertisements were "calculated with the ordinary reader to deprave him, deprave his morals, or lead to impure purposes."

The Court approved an instruction that left the question of "what is (are) obscene, lascivious, lewd, or indecent pub-

The government cites and relies upon *Dunlop* for the apparent reason that this case has not yet been expressly overruled by the Supreme Court.[20] If *Dunlop,* however, states the law today, then the Kansas City Star and its officials are subject to criminal prosecution under the fourth paragraph of Section 1461 for the reason that the personal column in that newspaper daily carries want ads which advertise where massages can be obtained from both men and women.[21]

We believe that the Supreme Court will deal with *Dunlop* and its rationale in the same manner that and other courts have dealt with United States v. Hornick (3 Cir. 1956) 229 F.2d 120, another case upon which the government strongly relies in this case. *Hornick* held that in a prosecution under the fourth paragraph of Section 1461 "the announcement itself is not required on its face to promise obscene material if that is its purpose" (229 F.2d at 121). In affirming the convictions, the Third Circuit stated that even if the advertisement itself could not be said to be obscene, the conviction should nevertheless be affirmed. That conclusion was based on the notion that the defendants were guilty if the advertisement they published merely purported "to give in-

formation as to where obscene matter could be obtained." That court held that such proof was "enough to make them guilty under the statute." The government cannot any longer seek to base prosecutions on the unique and unusual construction placed on Section 1461 in *Hornick*.

Judge Irving Kaufman, when a district judge, found it unnecessary "to decide the question of the vitality of *Hornick*" on a motion to dismiss. He noted, however, that *Hornick* appears to have had "no predecessors and no progeny" (an expression more familiar to Missourians than to most New Yorkers). See United States v. Schillaci (S.D.N.Y. 1958) 166 F.Supp. 303 at 306.

In Poss v. Christenberry (S.D.N.Y. 1959) 179 F.Supp. 411, Judge Bryan expressly rejected *Hornick*. The Fifth Circuit avoided reliance upon *Hornick* in Kahm v. United States (5 Cir. 1962) 300 F.2d 78, 79 at 80, cert. den. 369 U.S. 859, 82 S.Ct. 949, 8 L.Ed.2d 18 (1962). And wisely so, because Mr. Justice Harlan, speaking for the majority in *Manual Enterprises,* supra 370 U.S. at 491, 82 S.Ct. at 1439 expressly held that *Hornick's* "approach to the statute could not withstand the underlying precepts of *Roth*."

---

lications is largely a question of your own conscience and your own opinion."

For the latitude given the prosecutor it stated:

"Now, gentlemen, it is not necessary for me to tell you what the massage treatment is; how a man is stripped naked, from the sole of his feet to the crown of his head, and is rubbed with the hands." If the counsel gave a wholly erroneous definition of the word "massage," or misled the jury by giving them a false impression of the operation, the remark might be prejudicial, and possible ground for error. But as the word is defined as "a rubbing or kneading of the body," an operation which could hardly be carried on unless the person were divested of his clothing, we see no error in the remark of the district attorney in this case. As the massage treatment is comparatively a recent device, it is quite possible that it may not have been understood by all

the members of the jury, but if the district attorney fairly explained to them what it is ordinarily understood to be, and gave an explanation which was not radically wrong, there was no impropriety in his doing so. [165 U.S. at 498–499, 17 S.Ct. 375, 379.

20. Indeed, the majority opinion in *Roth* gave two pages of *Dunlop* a "Cf." citation in footnote 30, page 492 of 354 U.S., 77 S.Ct. 1304. We do not, however, consider that citation as an approval of the rationale of *Dunlop*.

21. The Baths and Massage sections in the Yellow Pages of the Greater Kansas City Telephone Directory list any number of lady massage operators, one of whom specializes in no less than nine types of massage, together with "Stimular-Electro-Magnetic-Swedish-Russian-German and Combination Massages," whatever those may be.

Should we read the "pandering" language of *Ginzburg* so broadly as to permit conviction in this case, we believe that defendant's conviction would be for running a "pimping-by-mail enterprise," to use the government's expression, instead of a violation of Section 1461. No existing federal law, save perhaps the Mann Act under highly unusual factual circumstances, even purports to prohibit such an enterprise.

Although used in a different context, the language in Mr. Justice Stewart's dissent in *Ginzburg* which directed attention to the fact that no federal statute "makes 'commercial exploitation' or 'pandering' or 'titillation' a criminal offense" is apposite (383 U.S. at 500, 86 S.Ct. at 957).[22]

## IV.

Our construction of Section 1461 is consistent with the better reasoned cases which have considered the same question. It was before the turn of the century that the Supreme Court noted in Swearingen v. United States, 161 U.S. 446, 451, 16 S.Ct. 562, 564, 40 L.Ed. 765 (1896), that what is now Section 1461

"is highly penal" and stated that "the statute * * * should not be held to embrace language unless it is fairly within its letter and spirit."[23]

We recognize that it has been said that Congress made "changes [in the statute which] were intended to reverse the limitations stated in Swearingen v. United States" shortly after that case was decided. See opinion of Mr. Justice Brennan in *Manual Enterprises, supra.* Certainly the Congress added the word "filthy" to the statute, as Mr. Justice Brandeis pointed out in United States v. Limehouse, 285 U.S. 424, 52 S.Ct. 412, 76 L.Ed. 843 (1932), apparently for the purpose of keeping the Court from reversing such political bombast cases as *Swearingen's.*[24]

But the Congress did not, indeed, it could not, under present day controlling decisions, repeal the constitutional principle stated in *Swearingen* that a penal statute may not properly be construed to embrace language unless it is fairly within the letter and spirit of the statute. The fact that the particular statute involved in *Swearingen* was re-

22. See like statements of Mr. Justice Harlan and Mr. Justice Black's agreement at 383 U.S. 493–494 and 477, 86 S.Ct. 942, respectively. Our references to language from dissenting opinions in *Ginzburg* does not mean that we consciously refuse to obey the command of the majority opinion in that case.

23. That case reversed a conviction of the editor of the Burlington (Kansas) Courier, apparently a Populist, who called a political opponent (allegedly "pretending to serve Democracy [but who] is in the pay of the Republican Party") a "red-headed, mental and physical bastard," a "black hearted coward," a "liar, perjurer, and slanderer, who would sell a mother's honor with less hesitancy and for much less silver than Judas betrayed the Saviour, and who would pimp and fatten on a sister's shame with as much unction as a buzzard gluts in carrion." In summary, that editor called his political opponent "a contemptible scoundrel and political blackleg of the lowest cut [who is] lower, meaner, filthier, rottener than the rottenest strumpet that prowls the streets by night, [whose] soul, if he has

a soul, is blacker than the blackest shades of hell."

The general message that the Populist editor apparently wished to convey to other Populist newspapers was that they should "snub him, quit him cold, ignore him entirely, the sooner will he cease to be thought of only as a pimp that any man can buy for $1 or less." We suspect that the prosecution and conviction for violation of the Comstock law in the District of Kansas did not go unnoticed in the public media of those turbulent days of Kansas politics.

24. In Winters v. New York, 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 (1948), the Supreme Court struck down "a vague statute [of New York] abridging free speech [which] involves the circulation of only vulgar magazines" (333 U.S. at 518, 68 S.Ct. at 671). In recognition of the temptation implicit in *Swearingen* to put one's political opponents in prison, the Court stated that "the next [case] may call for decision as to free expression of political views in light of a statute intended to punish subversive activities." (333 U.S. at 518, 68 S.Ct. at 671).

lated to what the Court called "that form of immorality which has relation to sexual impurity," to use the words of that case (echoed in many later cases), did not prevent the Court from applying a cardinal constitutional principle of statutory construction to what is now Section 1461. Nor has that fact prevented other courts since *Swearingen* to hesitate to do the same thing.

The question of whether a defendant may be convicted of mailing a letter which was not obscene *per se*—and therefore not within the Congressional declaration of nonmailable matters—when his purpose for mailing the letter was immoral was reasonably well settled before *Roth* and other recent Supreme Court cases were decided. There is, of course, a line of early cases that could be said to support the notion that Section 1461 was enacted to declare nonmailable nonobscene propositions for sexual meetings even though the language used in the statute could not fairly be said to embrace such matters.[25] See United States v. Martin (W.D.Va. 1892) 50 F. 918; United States v. Moore (W.D.Mo.1904) 129 F. 159; and Parish v. United States (4 Cir. 1917) 247 F. 40, for examples in which the statute was so construed. In *Moore*, Judge Philips of this Court expressly refused to follow United States v. Lamkin (E.D. Va.1896) 73 F. 459, a case to the contrary, on the ground that he simply disagreed with holding of that case which Judge Philips correctly stated was "that unless the language employed in the letter is per se coarse, obscene, lewd, lascivious, or indecent, although it is discernible on the face of the letter that it was written for the immoral purpose of inviting and stimulating illicit intercourse with a woman, it is not within the denunciation of the statute." [26]

*Lamkin* is the leading case opposed to the construction placed on Section 1461 by Judge Philips in *Moore*. We agree with what Judge Hughes held in *Lamkin*, both for the reasons stated by him and for the reason that his construction has been approved, at least by implication, by the Supreme Court and by the Eighth Circuit. After determining in *Lamkin* that the letters involved were not obscene *per se*, Judge Hughes assumed that the letter there involved was "for the purpose of seduction, or for assignations," which he stated was regarded as "a heinous offense against society." But, he added, "I do not see that that is an offense against any statute law of the United States."

Applying much the same rationale as we have applied in this case, Judge Hughes stated in *Lamkin:*

> In order for the sending of such letters to be cognizable by the federal courts, two things must concur: First, the letters shall be mailed; and, second, the offense of mailing letters intended for seduction or procuring immoral assignations shall be made penal by some express statute of the United States. I repeat that I know of no law of the United States making penal the mailing of letters intended for seduction or for procuring such assignations. [73 F. at 463].

---

25. A proposition for sexual encounter could easily be phrased in language which is "rude, vulgar, uncouth, offensive", "ill-mannered" or "crude" without being "obscene, lewd, lascivious, indecent, filthy or vile," within the meaning of Section 1461. Indeed, literature is replete with examples of such propositions being made in quite "elegant, graceful, polished, mellifluous, felicitous or refined" language.

26. Judge Philips based his conclusion on the idea that "the obscene, lewd, lascivious, indecent character of the writing is not to be made to depend upon the fact that the language employed must be coarse, blunt, and bald. * * * Words abstractly considered, may be free from vulgarism, yet they may, by reason of the context, manifest to the intelligent apprehension the most impure thoughts, and may arouse a libidinous passion more effectually in the mind of a modest woman than the coarse vernacular of the bawd and the pimp. The poison of the asp may lie beneath the honeyed tongue, just as a beautiful flower may contain a deadly odor." [129 F. at 161]

Referring to what is now Section 1461, he stated that:

> The statute does not declare that the letter must be written for an indecent or obscene purpose, but that the letter itself, in its language, shall be of indecent character. The letters set out in the indictment are not themselves of indecent character, and, if used for such purposes as have been named, congress has not made such purposes criminal. When a law denounces a letter containing obscene language, and does not denounce a letter decent in terms, but written for an indecent purpose, an indictment founded only upon the obscene purpose cannot be maintained. [Ibid] [27]

In Sales v. United States (8 Cir. 1919) 258 F. 597, the Eighth Circuit reversed a conviction obtained in this Court. It was clear from Judge Van Valkenburgh's charge that the government did not even contend that the letter (which the Court of Appeals did not set forth) was "in itself filthy or indecent." The Court of Appeals was therefore confronted with whether it would follow cases such as *Moore,* or whether it would construe and apply the language of the statute in accordance with more appropriate principles of statutory construction. Our controlling Court of Appeals followed the latter course, stating:

> *We know of no case under this clause of the statute in which it has been held that, if the letter or publica-*

*tion in itself is not objectionable, an undisclosed motive or intent of the writer may be found to convict him.* In Knowles v. United States, 95 C.C.A. 579, 170 F. 409, we held that a good motive was no defense to an evil publication. The converse is measurably true. If an undisclosed evil motive or intent can bring within the statute a letter or publication that is innocent and mailable upon its face, convictions could be sustained in cases of simple newspaper "want ads," upon proof of an evil "ultimate purpose, motive, or intent" in the mind of an advertiser or publisher who employed the mails. Doubtless that would be a proper field for legislation, but we do not think the statute before us goes so far. [258 F. at 598]. (Emphasis ours).[28]

Dysart v. United States, 272 U.S. 655, 47 S.Ct. 234, 71 L.Ed. 461 (1926) reversed a conviction affirmed by the Fifth Circuit which was based on matter that the Solicitor General conceded was not obscene *per se.* The matter involved was a letter advertising a home for the care and protection of pregnant unmarried women and their infants. The Court stated:

> Notwithstanding the inexcusable action of petitioner in sending these advertisements to refined women, it is not possible for us to conclude that the indictment charges an offense within the meaning of the statute as con-

---

27. Speaking out against what he termed as "judge-made" penal laws, Judge Hughes stated: "Cases have been cited at bar showing that several courts have interpolated into the statute—have 'read into the law'—from which I have quoted language which makes it virtually read: 'Every obscene, lewd or lascivious letter of an indecent character mailed [for the purpose of seduction or for procuring an immoral assignation] shall be punishable by fine and imprisonment.' If congress had intended that the crime should consist of writing and mailing indecent and obscene letters, written with such a purpose, it would have so declared. It did not interpolate such a purpose in the offense, and no court has a right to do

what congress did not do, and what congress could readily have done if it had intended to denounce the use of the mails for the purpose of seduction or procuring immoral assignations."

28. Sales v. United States is not the most satisfactory case in the books. That case actually said it approved *Moore* and Parish v. United States. We cannot understand how those cases could have been approved and the conviction be reversed. That question, however, is academic because of the Supreme Court's decision in Dysart v. United States, 272 U.S. 655, 47 S.Ct. 234, 71 L.Ed. 461 (1926), to be presently discussed in the text.

strued by the opinion just cited. [referring to Swearingen v. United States, 161 U.S. 446, 16 S.Ct. 562, 40 L.Ed. 765 (1896)]. [272 U.S. at 658, 47 S.Ct. at 234].

The Fourth Circuit case of Krause v. United States (4 Cir. 1928) 29 F.2d 248, read *Dysart* as we read it and retracted from the position it had earlier taken in *Parish*. The matter involved in *Krause* was a letter from one homosexual to another extending an invitation to meet again. If the sexual tastes of the correspondents had been unknown, no one would have given the letter a second thought; it could not be said to be obscene. Those facts were, however, made known to the jury. The defendant was convicted and sentenced to Atlanta for two years.

In reversing the district court and directing the prosecution dismissed, the Fourth Circuit stated that "the real question to be determined in this case is whether the letter, the subject of the alleged infraction of the statute, is one that comes within its meaning and purpose." In ruling that question, the court stated that "the letter here was written by one man to another, and does not on its face contain a single obscene, lewd, or lascivious word, or a suggestion of an immoral or indecent character, and in the absence of such obscene word or indecent suggestion in the letter no such construction can be given thereto." It therefore held:

The statute alone creates and defines the crime, and the government cannot, by suggestion, innuendo, averment, or charge, add to its provisions, nor can it widen the statute's application by adding to the letter or writing something not contained therein. [29 F.2d 248 at 251].

The court pointed out that any other construction of Section 1461 would enable the government to ignore the fact that the particular "matter" involved was not "nonmailable" under the statute and to permit the government to try the case upon "what the government is pleased to term the purpose and intent of those alleged to have violated the statute." The court stated:

The indictment was for the misuse of the mails for an alleged immoral purpose by the use of a letter wholly insufficient to support the charge, whereas the trial resulted, in effect, in a conviction for the offense of sodomy, not covered by any federal statute, but by a law of the state of Maryland prescribing · punishment for such offense. [Ibid].

■ Our construction of Section 1461 is consistent with the earlier cases cited. Like those courts, we believe it clear that if the matter deposited in the mail cannot properly be classified as obscene *per se* and therefore nonmailable, a conviction cannot be sustained on proof that the purpose the defendant had in mind when he used the mail was to engage in what the government in this case calls a "pimping-by-mail enterprise."

The Congress had not made such activity illegal. It is beyond our power to amend the statute. The defendant may not therefore be convicted under the fourth paragraph of Section 1461 as it presently reads. That was the only charge included in the indictment. He cannot be guilty of an offense for which he was not indicted.

### V.

The government included in the stipulation of facts a paragraph which stated that: "the Post Office Department received complaints from 53 individuals who reside in various states of the United States as to the unsolicited receipt by these persons of copies of the publication entitled 'The Swinging Set' by delivery through the mail to their addresses, one such individual being a minor, and that 30 of these complaints concern the receipt of issues 10, 11, and 12 of the publication."

The inclusion of that paragraph in the stipulation of facts reflects the government's concern that publications such as "The Swinging Set" were in fact received by adults and at least one minor who did not place their own names on the

mailing list.[29] Congress expressed a like concern when it passed Public Law 87–793, § 307, October 11, 1962, 76 Stat. 841 (published in the historical and revision note to 39 U.S.C.A. § 4001). That statute provided in part that:

> Any person may file a written request with his local post office to detain obscene, lewd, lascivious, or indecent matter addressed to him, and the Postmaster General shall detain and dispose of such matter for such period as the request is in effect.

Each of the issues of "The Swinging Set" carried a notice that a recipient would have his name removed from the mailing list by returning the address label. We can understand that one receiving such a publication might not believe anything in it. We can also understand that many individuals are not familiar with the recent Congressional legislation under which they could have had their local post office stop delivery. The fact that there were other means available to prevent persons from being unwilling recipients of publications such as "The Swinging Set" does. not mean that other laws may not be enacted to accomplish the same purpose.

Judge Lay in *Luros* forecast the constitutionality of a statute which "relates to a limited *state* concern for juveniles" (389 F.2d at 202, his emphasis).[30] He also suggested that appropriate legislation could prohibit "an obtrusive 'assault' by pornography upon an unwilling individual." (389 F.2d at 202). Certainly, the act of October 11, 1962 above quoted has for its design the protection against non-consensual receipt of publications such as "The Swinging Set."

But to say that there are legitimate areas within which the Congress may exercise legislative power without violation of the First Amendment is not to say that the Congress in fact exercised that power when it enacted Section 1461. Indeed, we think it can fairly be said that such an idea never occurred to the authors of what is now Section 1461. It is reasonably apparent that the existing federal legislation relating to obscenity was written without any apparent recognition that any serious question of constitutional law was involved.[31]

The Department of Justice memorandum to United States Attorneys dated

---

**29.** The evidence in the case suggests that publishers in this field engage in the sale and purchase of mailing lists and that some of the publications carry requests for the addition of names of persons whom the subscribers believe might be interested. It is easy to speculate how one received "The Swinging Set" without having asked for it.

**30.** A few months after *Luros* was decided the Supreme Court sustained such a statute passed by the State of New York in Ginsberg v. New York, 390 U.S. 629, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968).

**31.** The Commission on Obscenity and Pornography established by Public Law 90–100, October 3, 1967, 81 Stat. 253 (published in the 1967 cumulative annual pocket part following annotation to 18 U.S.C.A. § 1461) gives full recognition to the complexity of the problems involved. The duties imposed on that Commission are as follows:

Sec. 5. (a) Investigation and Recommendations,—It shall be the duty of the Commission—

(1) with the aid of leading constitutional law authorities, to analyze the laws pertaining to the control of obscenity and pornography; and to evaluate and recommend definitions of obscenity and pornography;

(2) to ascertain the methods employed in the distribution of obscene and pornographic materials and to explore the nature and volume of traffic in such materials;

(3) to study the effect of obscenity and pornography upon the public, and particularly minors, and its relationship to crime and other antisocial behavior; and

(4) to recommend such legislative, administrative, or other advisable and appropriate action as the Commission deems necessary to regulate effectively the flow of such traffic, without in any

August 31, 1964 reflects additional procedures which, if followed, would, as a practical matter, prevent many publications such as "The Swinging Set" from being deposited in the United States mail. Or at least that is the apparent theory upon which the Department of Justice memorandum is based.

That memorandum appropriately recognized that in many instances those who publish such matters are in need of psychiatric attention and care and that inquiry into that subject should be made before prosecution is commenced.[32]

The fact that publications such as "The Swinging Set" are received by persons who do not want them and the fact that there are existing procedures which, if intelligently utilized, would tend to prevent unwilling persons from receiving such publications has absolutely nothing to do with the legal and factual questions presented in this case. The decisive question, as we have stated, boils down to the relatively simple proposition of whether Section 1461, under the facts presented, can be utilized to stop the publication of "The Swinging Set" by putting its publisher in the penitentiary. We simply find that the government did not adduce sufficient evidence upon which a conviction may be properly sustained.

---

way interfering with constitutional rights.

(b) Report,—The Commission shall report to the President and the Congress its findings and recommendations as soon as practicable and in no event later than January 31, 1970. The Commission shall cease to exist ten days following the submission of its final report.

32. The Department of Justice memorandum dated August 31, 1964 states in part:

The United States Attorney should determine initially whether a stern warning and declination of prosecution is adequate in the particular case. This disposition should suffice in the routine cases of consensual, obscene private correspondence.

In all other cases in this area, the United States Attorney should give serious consideration to exploring with defense counsel voluntary submission by the accused to psychiatric evaluation, the report to be made available to the United States Attorney. Such an evaluation should be of real assistance to the United States Attorney in determining his future course of action, bearing importantly on such factors as prospects for rehabilitation of the subject, including his need for and probable response to psychiatric treatment, and the likelihood of his being a danger to society. Should the report indicate that psychiatric treatment may help the subject and the subject agrees to undertake treatment, the United States Attorney may defer action for a reasonable period of time to insure that the agreement is being carried out in good faith. Whether an individual will benefit from treatment is admittedly conjectural; but if there appears to be a favorable possibility and there are no seriously aggravating circumstances attending the violation, we think it desirable to give this approach a fair trial * * *.

United States Attorneys should not indulge in the practice of routinely referring obscene correspondence cases to state prosecutors. For example, it would be clearly inconsistent for the United States Attorney to decline prosecution because he has determined that a warning or psychiatric treatment would be an adequate remedy and, thereafter, refer the case to state authorities for possible prosecution. This is not to say that there may not be instances in which deferment to state jurisdiction is entirely appropriate. We realize, of course, that postal inspectors are free to present their evidence to state authorities where the United States Attorneys decline to prosecute.

Another portion of that memorandum makes clear that "in appropriate cases involving non-consensual correspondence, United States Attorneys may desire to employ the procedure set forth as to consensual cases."

We are advised that the government did not follow the procedure suggested in the 1964 memorandum in this case.

We have fully stated the reasons why we can not read Section 1461 or the cases which have construed that section as authorizing prosecution and conviction under the undisputed factual circumstances presented in this case. We fully recognize that we are commanded by *Ginzburg* to consider "pandering" as a factor which might make matters not otherwise nonmailable to become so under the facts of a particular case. But we can not believe that what the Supreme Court said about "pandering" in *Ginzburg* is to be construed as a legislative amendment to Section 1461. In that statute Congress stated that it intended to declare as "nonmailable" only those matters which gave "information, directly or indirectly, where, or how, or from whom" existing "obscene * * * matters" could be "obtained." Congress did not even purport to prohibit correspondence, not obscene on its face, which had as its purpose and design engagement in illegal sexual adventures.

The government has not made proof of the offense embraced by the statute. Perhaps it could be said that the government established that the defendant was engaged in a "pimping-by-mail enterprise." We reiterate that the defendant was not—and could not—be charged with that offense under existing federal law. Whether such conduct should be made an offense against the laws of the United States is not for this Court to say. The job of making appropriate recommendations to the Congress has been delegated to the Commission on Obscenity and Pornography to which we have referred. We wish that Commission well because prosecutions under the present statute have not been considered by many to suggest that fundamental changes in that statute are unnecessary.

For the reasons stated, it is hereby

Ordered that the general finding of not guilty made pursuant to Rule 23 be filed of record. It is further

Ordered that the defendant be discharged.